F. H. PHILBRICK AND FLORENCE PHILBRICK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 53780.    Filed November 26, 1956.

*Harold R. Burnstein, Esq., John W. Hughes, Esq.,* and *John E. Hughes, Esq.,* petitioners.
*John E. Owens, Esq.,* for the respondent.

## OPINION.

PIERCE, *Judge:* The notice of deficiency herein was issued prior to the enactment of Public Law 629,[1] approved on June 29, 1956, which amended section 117 of the Internal Revenue Code of 1939 (relating to capital gains and losses) by adding at the end thereof a new subsection (q), relating to transfer of patent rights. Also the trial of the present case was had, and the briefs of both parties were filed, prior to such enactment. The petitioners have, however, now invoked said amendatory statute, by letter addressed to the Court with a copy mailed to respondent's counsel. The respondent has not advised the Court of his position respecting the same.

## I.

Prior to considering the application of this new section 117 (q), it is necessary to define the nature and scope of the issue here presented. In the notice of deficiency, the respondent made only one adjustment to the petitioners' returns: He determined that the amounts of $33,-526.65 and $44,920.28, which Philbrick received from the Pullman Company, pursuant to paragraph 4 (a) of the exclusive license agreement, constituted "royalties" taxable as ordinary income, rather than

---

[1] Pub. L. 629, 84th Cong., 2d Sess., ch. 464 (H. R. 6143), 70 Stat. 404.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 117 of the Internal Revenue Code of 1939 (relating to capital gains and losses) is hereby amended by adding at the end thereof a new subsection as follows:

(q) TRANSFER OF PATENT RIGHTS.—

(1) GENERAL RULE.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(A) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(B) contingent on the productivity, use, or disposition of the property transferred.

(2) "HOLDER" DEFINED.—For purposes of this subsection, the term "holder" means—

(A) any individual whose efforts created such property, or

(B) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

(i) the employer of such creator, nor

(ii) related to such creator (within the meaning of paragraph (3)).

(3) EXCEPTIONS.—This subsection shall not apply to any transfer described in paragraph (1)—

(A) by a nonresident alien individual, or

(B) between an individual and any related person.

For purposes of this paragraph, the term "related person" means a person, other than a brother or sister (whether of the whole or half blood), with respect to whom a loss resulting from the transfer would be disallowed under section 24 (b).

(4) APPLICABILITY.—This subsection shall apply with respect to any amount received, or payment made, pursuant to a transfer described in paragraph (1) in any taxable year beginning after May 31, 1950, regardless of the taxable year in which such transfer occurred.

long-term capital gains as reported in the petitioners' returns. The respondent has made it clear, both in the opening statement of his counsel at the trial and also in his briefs, that this is the basic issue presented. More specifically, he has taken the position that the exclusive license agreement did not effect a "sale" of capital assets for income tax purposes; and that insofar as the decision of this Court in *Edward C. Myers*, 6 T. C. 258, is in conflict with such position, the opinion in the *Myers* case should be overruled.

On brief, however, the respondent has attempted to raise a new and additional issue. He has pointed out that applications for patents on three of Philbrick's improvement inventions, which concededly became available to the Pullman Company under the terms of the exclusive license agreement, were not filed until after the execution of said license agreement, and until after the employment contract had become operative; and hence he contends that, even assuming that such improvement inventions were capital assets in Philbrick's hands, all royalties attributable to them should be taxed as "additional compensation for personal services" under the employment contract.

This new and additional issue was not raised in the notice of deficiency, or pleaded by respondent in his answer to the petition, or suggested by respondent's counsel during his opening statement at the trial. To the contrary, the stipulation of facts was prepared, and the evidence was presented, without notice either to the Court or to petitioners' counsel that such issue was present. In this situation, we sustain the objection and contention of the petitioners, that such additional issue was not adequately or timely raised and therefore is not properly before this Court. As was stated by the Supreme Court in *General Utilities & Operating Co.* v. *Helvering*, 296 U. S. 200, at page 206:

Always a taxpayer is entitled to know with fair certainty the basis of the claim against him. Stipulations concerning facts and any other evidence properly are accommodated to issues adequately raised.

This Court has held frequently that issues raised for the first time on brief will not be considered. *Sangston Hettler*, 16 T. C. 528, 535; *Maurice P. O'Meara*, 8 T. C. 622, 628; *Wentworth Manufacturing Co.*, 6 T. C. 1201, 1208.

Thus, the issue is limited to the question raised by the deficiency notice: Whether the amounts received by Philbrick in 1951 and 1952, pursuant to paragraph 4 (a) of the exclusive license agreement, are taxable as long-term capital gains, or as ordinary income from "royalties."

## II.

We turn now to a consideration of section 117 (q), as added by Public Law 629. A review of the circumstances which gave rise to the enact-

ment of this statute is helpful in determining its purpose and applicability.

In 1946 this Court held in the above-mentioned case of *Edward C. Myers, supra*, that where an inventor had, in consideration of certain annual payments or "royalties" to be made to him, granted an exclusive license to another party to use, manufacture, and sell an invention which he had theretofore held for more than 2 years but in respect of which he had not filed an application for a patent, such exclusive license should be regarded for income tax purposes as a sale by him of his invention; and that gains thereafter derived from payments under such license agreement were taxable as long-term capital gains. The Commissioner of Internal Revenue, at first, published his acquiescence in the *Myers* decision (1946–1 C. B. 3), which meant, as stated in an accompanying announcement, that the decision should be relied upon by officers and employees of the Bureau of Internal Revenue as a precedent in the disposition of other cases.

Subsequently however, in 1950, the Commissioner reversed his position with respect to the *Myers* case; and in a ruling (Mim. 6490, 1950–1 C. B. 9), he withdrew his acquiescence, substituted a nonacquiescence, and held in substance that royalties under exclusive license agreements, received for taxable years beginning after May 31, 1950, would be regarded as ordinary income. This action resulted in the renewal of litigation respecting the proper tax treatment of such royalties.

At the time when the Internal Revenue Code of 1954 was being drafted, the Congress took note of the above situation; and it included in section 1235 of said Code, certain new provisions relating to the transfer of patent rights. These new provisions are substantially the same as those subsequently enacted as the first section of Public Law 629. The report of the Senate Finance Committee regarding section 1235,[2] discloses that the purpose of these provisions was: "To obviate the uncertainty caused by this mimeograph [Mim. 6490] and to provide an incentive to inventors * * * [by giving] statutory assurance to certain patent holders that the sale of a patent (whether as an 'assignment' or 'exclusive license') shall not be deemed not to constitute a 'sale or exchange' for tax purposes solely on account of the mode of payment."

Section 1235 applies, under the terms of the 1954 Code, only to payments described therein which are received in taxable years beginning after December 31, 1953, and ending after August 16, 1954. Shortly after the section was enacted, the Commissioner announced (Rev. Rul. 58, 1955–1 C. B. 97) that, as regards any such payments received in taxable years beginning after May 31, 1950 (the effective date of his

[2] S. Rept. No. 1622, 83d Cong., 2d Sess., p. 439.

Mim. 6490), and prior to the effective date of the 1954 Code, he would continue to adhere to the position stated in his mimeograph. Thus, there arose the anomalous situation that payments of the type described in section 1235.would be regarded by the Commissioner as proceeds from the sale of a capital asset, if they were received during taxable years beginning either before May 31, 1950, or after the effective date of section 1235 of the 1954 Code; but that such payments, even though they arose out of the same transfer of patent rights, would be regarded as ordinary income if they were received in any intervening taxable year.

It was to correct this situation that Public Law 629 was enacted. Its practical effect was to render inoperative, both Mimeograph 6490 and Revenue Ruling 58, *supra*, insofar as they relate to transfers described in the new subsection (q); and to make benefits like those provided by section 1235 of the 1954 Code available for any taxable year beginning after May 31, 1950.[8]

## *III.*

Section 117 (q) of the 1939 Code, as added by Public Law 629, provides, in part, as follows:

(1) GENERAL RULE.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

　(A) payable periodically over a period generally coterminous with the transferee's use of the patent, or

　(B) contingent on the productivity, use, or disposition of the property transferred.

It should be observed that this new subsection (q) relates only to transfers described therein; and that it does not, by its terms, repeal any of the other subsections of section 117. Thus, if a transfer is not one described in subsection (q), the provisions of this subsection have no application in determining whether or not such transfer constitutes a sale or exchange of a capital asset; and the tax consequences of such transfer must be determined under other provisions of the internal revenue law. Conversely, if the transfer is one described in subsection (q), then the tax consequences thereof must be determined in accordance with the provisions of this new subsection, so as to give effect to the policy of Congress reflected therein.

The meaning of the phrase "all substantial rights to a patent," used in said subsection (q), is explained in the report of the Senate

---

[8] S. Rept. No. 1941, 84th Cong., 2d Sess., p. 4.

Finance Committee on the cognate provisions of section 1235 of the 1954 Code,[4] as follows:

The section does not detail precisely what constitutes the formal components of a sale or exchange of patent rights beyond requiring that all substantial rights evidenced by the patent (other than the right to such periodic or contingent payments) should be transferred to the transferee for consideration. This requirement recognizes the basic criteria of a "sale or exchange" under existing law, with the exception noted relating to contingent payments, which exception is justified in the patent area for "holders" as herein defined. To illustrate, exclusive licenses to manufacture, use, and sell for the life of the patent, are considered to be "sales or exchanges" because, in substantive effect, all "right, title, and interest" in the patent property is transferred (irrespective of the location of legal title or other formalities of language contained in the license agreement). Moreover, the courts have recognized that an exclusive license agreement in some instances may constitute a sale for tax purposes even where the right to "use" the invention has not been conveyed to the licensee, if it is shown that such failure did not represent the retention of a substantial right under the patent by the licensor. It is the intention of your committee to continue this realistic test, whereby the entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee, rather than recognizing less relevant verbal touchstones. The word "title" is not employed because the retention of bare legal title in a transaction involving an exclusive license may not represent the retention of a substantial right in the patent property by the transferor. Furthermore, retention by the transferor of rights in the property which are not of the nature of rights evidenced by the patent and which are not inconsistent with the passage of ownership, such as a security interest (e. g., a vendor's lien) or a reservation in the nature of a condition subsequent (e. g., a forfeiture on account of nonperformance) are not to be considered as such a retention as will defeat the applicability of this section. On the other hand, a transfer terminable at will by the transferor would not qualify.

The phrase "rights to a patent," appearing in said subsection (q), appears also in section 1235 of the 1954 Code. The reports of the Senate Finance Committee and of the Conference Committee on this latter section indicate that such phrase was substituted, in lieu of a previously suggested phrase reading "rights evidenced by a patent," in order to make clear that the section applied, even though the patent itself might not have been issued at the time of the transfer, and even though an application for the patent might not then have been made.[5]

The term "holder," as used in subsection (q), is defined therein to include "any individual whose efforts created such property." The Senate Finance Committee, in its above-mentioned report on section 1235 of the 1954 Code, states on page 440 thereof, that such term embraces "all qualifying individuals, whether amateur or professional, regardless of how often they may have sold their patents." Thus,

[4] S. Rept. No 1622, 83d Cong., 2d Sess., pp. 439–440.

[5] Conference Report No. 2543, 83d Cong., 2d Sess., pp. 16, 70 ; S. Rept. No. 1622, *supra*, p. 439.

subsection (q) eliminates, in the case of a transfer described therein, not only the distinction between an amateur and a professional inventor, but also the problem as to whether the property transferred was held by the transferor primarily for sale to customers in the ordinary course of a trade or business.

Finally, subsection (q) provides that a transfer described therein "shall be considered the sale or exchange of a capital asset held for more than 6 months * * *." The Conference Committee, in its report on the cognate provision of section 1235 of the 1954 Code, states, on page 70 thereof, that "the requirement of a 6-month holding period is dropped." It follows therefore, that where payments are received pursuant to a transfer described in subsection (q), any gains or losses derived therefrom shall be treated as long-term capital gains or losses, irrespective of the actual period for which the property transferred may have been held.

In the instant case, Philbrick was the individual whose efforts created all of the rights to patents here involved; and he transferred such rights to the Pullman Company by means of an exclusive license "to make, to use, and to sell, and to have made for it, throughout the world, machines, apparatus and devices embodying the inventions set forth in the aforesaid Letters Patent and applications and any and all improvements therein and all other inventions relating to [such] machines * * * which the Licensor may devise or acquire during the term of this Agreement, * * *." In our opinion, Philbrick was a "holder," and his said transfer was, with respect to each of the properties involved, "A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent," within the meaning of section 117 (q) (1).

The parties in the instant case have stipulated that all payments here involved were received by Philbrick pursuant to the agreement for said exclusive license; and that they all were received during the years 1951 and 1952. Section 117 (q) provides in substance, in paragraph (4) thereof, that its provisions shall apply if the amount received or the payment made pursuant to a transfer described in paragraph (1) thereof falls within any taxable year beginning after May 31, 1950, "regardless of the taxable year in which such transfer occurred."

We hold that, under the facts here present, the provisions of section 117 (q) are applicable; and that, in accordance with said statute, the payments here involved are taxable as long-term capital gains.

Reviewed by the Court.

*Decision will be entered for the petitioners*