Hans C. Altmann and Johanna Altmann v. Commissioner.
Altmann v. Commissioner
Docket No. 1162-65.
United States Tax Court
T.C. Memo 1968-1; 1968 Tax Ct. Memo LEXIS 295; 27 T.C.M. (CCH) 1; T.C.M. (RIA) 68001; January 2, 1968, Filed Eugene F. Roth, 1 E. 57th St., New York, N. Y., for the petitioners. J. Q. Smith, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income taxes of $7,350.91 for the taxable year 1957, and $4,647.46 for the taxable year 1958. The issues presented are (1) whether the petitioner, Hans C. Altmann, realized in each year ordinary income, rather than long-term capital gain, as a result of endorsing over to a bank certain notes and receiving a credit to his account of an *296 amount representing the face amount of the notes less a discount, and (2) whether he received constructive dividends on account of automobile and entertainment expenditures made by Bernard Altmann International, Incorporated. Findings of Fact Petitioners are husband and wife, who, at the time of filing the petition, resided at Harrison, Westchester County, New York. They filed joint income tax returns for the taxable years 1957 and 1958 with the district director of internal revenue for the Manhattan District of New York. Hereinafter the husband will be referred to as the petitioner. In 1953 and prior years the petitioner and his father, Bernard Altmann, owned stock of corporations engaged in the business of manufacturing and selling cashmere products, woolens and worsted goods, and sweaters in the United States and abroad. Such corporations had been purchasing yarn for their domestic operations from other companies and then sending it to their manufacturing facilities in San Antonio, Texas. Although there were a large number of companies in the United States in the business of spinning yarn, there were only about 6 or 7 producing high quality yarn. Since the petitioner and his *297 father had experienced difficulty in obtaining good quality yarn, they decided that they would purchase a plant to produce high quality yarn. They considered about 20 mills as prospective purchases. In January 1954 they began negotiations with Susquehanna Mills, Incorporated (hereinafter referred to as Susquehanna), regarding the acquisition of its wholly owned subsidiary, High Rock Mills (hereinafter referred to as High Rock). High Rock had been engaged in the spinning and weaving of silk bags, but had not done any business since December 31, 1953. It had net 2 operating losses for its taxable years 1951, 1952, and 1953. The books and records of High Rock showed, as of January 1, 1954, an excess of assets over liabilities of $197,003.78. They showed accounts payable at that time of $393,300.29, of which about $123,000 was payable to Susquehanna and about $270,000 was payable to others. Petitioner and his father were in no way related to Susquehanna, and all of their dealings with that corporation were at arm's length. On January 15, 1954, the petitioner (acting for himself and his father equally) entered into an agreement with Susquehanna to purchase from it 50,000 shares *298 of common stock of High Rock (being all the outstanding stock of High Rock) and the entire obligations of High Rock to Susquehanna which might exist on the date of closing. [1] The agreement stated that such obligations from High Rock to Susquehanna would be evidenced by unsecured promissory notes as provided in paragraph 4.2 (a)(ix) and (x), namely, an unsecured promissory demand note of High Rock to the order of Susquehanna, endorsed without recourse to the order of the petitioner, in the sum of $370,043.14, plus all net advances made by Susquehanna to High Rock from July 31, 1953, to the date of closing, less the sum of $270,000, and another unsecured non-negotiable promissory note of High Rock to Susquehanna in the sum of $60,000 payable 6 years after the closing date, to be assigned by Susquehanna to the petitioner without recourse (such note to recite that it was subject to offset in the amount of any payment made by High Rock to the petitioner as mortgagee on notes in the amount of $320,000 to be given by High Rock to him). It was provided that Susquehanna would give High Rock a general release as to all its obligations to Susquehanna except those to be evidenced by the above *299 notes. It was further provided that the purchase price to be paid for the stock should be $2,500 and that the purchase price for the existing obligations of High Rock to Susquehanna should be $10,000. In the contract it was recited that as a further consideration for the sale petitioner would loan to High Rock upon the closing date the sum of $270,000 for which High Rock would issue to his order notes in the total amount of $320,000 in registered form or with interest coupons attached, maturing in the amount of $20,000 on February 1, 1955, and in the amount of $50,000 on August 1, and February 1 of each year thereafter until paid, such notes to be secured by a mortgage given by High Rock to him, which would be a first lien upon all the fixed assets of High Rock. The above contract resulted from weeks of bargaining to fix *300 the price to be paid for the High Rock stock and High Rock's obligations to Susquehanna. The closing date fixed in the agreement was January 29, 1954. At the closing the petitioner and his father paid $12,500 and there was endorsed over by Susquehanna to them notes executed by High Rock totaling $93,189.33, pursuant to the provisions of paragraph 4.2(a)(ix) of the agreement. On December 29, 1955, the petitioner and his father each held a demand note of High Rock in the amount of $46,594.67 (or a total of $93,189.33). Pursuant to an agreement of that date between them and High Rock, which recited that the parties desired to "extend the payment of said notes," each surrendered his note to High Rock and each received from High Rock 3 noninterest bearing promissory notes, payable to their order, in the amounts of $15,500 due June 30, 1957, $15,500 due June 30, 1958, and $15,594.67 due June 30, 1959. [2]
*301 On March 8, 1957, petitioner endorsed in blank the note payable June 30, 1957, and delivered it to the First National City Bank of New York with instructions to discount it and credit the proceeds to his account. The bank credited his account with an amount of $15,264.81, which represented the face amount of $15,500 less a discount of $235.19, which was at a rate of 4 3/4 percent for the 115 days remaining before maturity of the note. On February 10, 1958 petitioner endorsed in blank the note due June 30, 1958, and delivered it to such bank for discounting and crediting to his account. The bank credited his account with an amount of $15,198.61, which represented the face amount of $15,500 less a discount of $301.39, which was at a rate of 5 percent for the 140 days 3 remaining before the maturity of the note. In each instance the note was discounted before its due date in order to obtain funds which a foreign corporation owned by petitioner and his father needed for its seasonal operations. High Rock paid to the bank the face amount of each of the notes on its due date. In his income tax return for the taxable year 1957, the petitioner reported long-term capital gain of $10,500 *302 derived upon the discounting of the note due June 30, 1957. He reported that the note had been acquired on January 28, 1954, that the gross sales price was $15,500, and that the basis of the note was $5,000. In the return he claimed the amount of the discount, $235.19, as an itemized deduction of interest paid. In his income tax return for the taxable year 1958, the petitioner reported long-term capital gain of $15,500 derived upon the discounting of the note due June 30, 1958. He reported that the note had been acquired on January 28, 1954, and that the gross sales price was $15,500, but he claimed no basis for the note. In the return he claimed the amount of the discount, $301.39, as an itemized deduction of interest paid. In the notice of deficiency the respondent determined that the petitioner "realized a gain of $14,488.18 with respect to each of 2 notes of High Rock Mills, Inc., one of which matured June 30, 1957; the other of which matured June 30, 1958" and that "this gain is taxable as ordinary income." He computed the gain in each case as follows: Face amount of note
$15,500.00
Basis ($15,500.00[$10,000.00 $153,189.33]) 1,011.82
Gain
$14,488.18
*303 In 1957 and 1958 the petitioner was executive vice president of Bernard Altmann International Corporation, a domestic corporation the common stock of which was owned by him and his father. During those years the petitioner used an automobile owned by that corporation principally on behalf of the corporation, but to some extent for his personal purposes. During those years the petitioner also incurred expenditures on behalf of the corporation for travel in the United States and in Europe and for entertainment of buyers and sellers, for which he was reimbursed by the corporation. At times the corporation disbursed the expenditures directly. In the notice of deficiency the respondent determined that for the taxable years 1957 and 1958 the petitioner realized dividend income in the amounts of $2,402.83 and $2,215.83, respectively, "by reason of expenditures by B. Altmann International Corp. which were found not to be allowable deductions to the corporation." These amounts were described as "Allocated share of disallowed auto and entertainment expense." Opinion The respondent does not contend that the notes in question were not capital assets and we see no reason for concluding that *304 they were not. He takes the position that such notes should be considered as having been issued when the prior demand notes which they supplanted were issued, namely, January 29, 1954, instead of the date they bore, December 29, 1955, which was the date on which the old notes were surrendered; that, therefore, such notes come within the exception contained in the parenthetical language contained in section 1232(a)(1) of the Internal Revenue Code of 1954; [3] that 4 the transfers of the notes to the bank did not constitute sales of the notes, but hypothecation thereof as security for loans made by the bank to the petitioner; that when High Rock paid the bank the face amount of the notes at maturity this amounted to a retirement of the notes held by the petitioner, since he was the beneficiary of such payments; and that consequently the petitioner was in receipt of ordinary income upon such transactions. *305 The petitioner, on the other hand, contends that the notes in question were issued, within the meaning of the statute, on the date they bore, namely, December 29, 1955; that therefore the exception contained in the parenthetical portion of section 1232 (a)(1) is not applicable; and that whether or not the transactions with the bank amounted to retirement of the notes or sales thereof, any gain resulting therefrom is to be treated as long-term capital gain. He further contends that in any event the transfers to the bank constituted sales of the notes and that accordingly the transactions resulted in longterm capital gain irrespective of which of the two dates is considered the issue date. We will first consider the question whether the transactions whereby the notes were transferred to the bank constituted sales of the notes or the mere hypothecation thereof as security for loans from the bank to the petitioner. The notes were endorsed in blank and delivered to the bank with instructions to discount them and credit the proceeds to the petitioner's account, and this was done. The respondent maintains that since the petitioner under these circumstances remained liable in the event *306 of default by the obligor of the notes, the transactions must be considered as loans. In this connection he refers to the case of National Bank v. Johnson, 104 U.S. 271. The court in that case stated that the discount upon notes transferred to a bank upon an endorsement with recourse constituted interest. It reasoned that discount is the difference between the price paid and the amount of the debt, the evidence of which is transferred, that such difference represents interest charged, and that therefore the advance upon a discounted note may properly be denominated a loan. However, such statement was made in connection with the court's conclusion that the national bank there involved had violated section 5197 of the Revised Statutes of the United States, which prohibited any national banking association from charging an excessive rate of interest on "any loan or discount made." The court stated, however, that it was immaterial whether there was a loan or a discount since both were expressly made subject, by section 5197, to the same rate of interest, and that unquestionably if the transaction was not a loan it was a discount. Under the circumstances, we think the case *307 of National Bank v. Johnson, supra, is not determinative of the question whether, for present purposes, the transactions constituted sales or loans. It has been recognized that the "discounting" of a promissory note may, depending upon the circumstances, constitute either a loan or a sale. Thus, as stated in Elmer v. Commissioner, (C.A. 2) 65 F. 2d 568, affirming 22 B.T.A. 224. Such transactions are somewhat ambiguous and admit of definition as loans or sales on slight differences. If a merchant discounts his customer's note at a bank, endorsing it, but getting immediate credit for its discount value, it would be a most unnatural thing to consider it a loan from the bank. He remains liable if the customer defaults, but the collection is in the bank's hands, and the transaction is closed in the absence of a default. If, on the other hand, a merchant pledges his accounts to a "finance" company and collects them himself, paying the loan out of his collections, it is clearly a loan, and has always been so considered. The burden of proof is, of course, upon the petitioner to establish that the transactions with the bank constituted sales, rather *308 than loans. Upon a consideration of the whole record it is our conclusion that he has met his burden. The evidence shows that payment of the notes was made by High Rock at maturity directly to the bank, rather than to the petitioner. Furthermore, while the evidence is not as detailed as might be desired, we think it sufficient to establish that there was no understanding between the petitioner and the bank that the amounts credited to petitioner's account would be considered as loans owing by him to the bank and that the notes were merely hypothecated as security for such payment. The substance of the petitioner's testimony 5 was that all that transpired was that pursuant to his request the bank gave him cash for the notes. We accordingly conclude that the transfers of the notes to the bank constituted sales thereof. In view of this conclusion, it is immaterial whether the notes are considered as having been issued before January 1, 1955, or on or after that date. On brief the respondent makes the argument that High Rock was thinly capitalized; that the notes in reality represented equity capital; and that the payments made by High Rock in discharge thereof at maturity constituted *309 dividend income. With respect to this contention, however, it is sufficient to point out that it is inconsistent with the respondent's determination made in the notice of deficiency wherein he assigned a basis to the notes and calculated a gain upon the disposition thereof, instead of treating the full amount of the payments as dividends, and that he has not raised any such issue in his pleadings. Issues raised for the first time on brief will not be considered. F. H. Philbrick, 27 T.C. 346. The respondent further contends that even if there were sales of the notes, the gain should be treated as ordinary income, citing Goldstein v. Commissioner, (C.A. 2) 364 F. 2d 734, affirming 44 T.C. 284, in which an interest deduction was disallowed on the ground that section 163(a) of the Code does not permit a deduction for interest paid in loan arrangements that cannot with reason be said to have any purpose, substance, or utility apart from anticipated tax consequences. The respondent claims that the sole purpose for the provision in the contract with Susquehanna that demand notes should be issued by High Rock to Susquehanna and then transferred to *310 the petitioner and his father was to obtain the benefit of the capital gains deduction of 50 percent under section 1202 of the Code upon the payment or disposition of such notes, and contends therefore that such capital gains deduction should not be allowed. We think that this contention of the respondent, under the circumstances of this case, is without merit. The acquisition of the notes was an integral part of the over-all transaction, negotiated at arm's length, whereby the petitioner and his father obtained all of Susquehanna's interest in High Rock. A part of Susquehanna's interest was that of a creditor. High Rock was obligated to Susquehanna for advances previously made, and it therefore cannot be said that the issuance of the demand notes to represent such indebtedness was a sham. The evidence clearly shows that the acquisition by the petitioner and his father of all of Susquehanna's interest in High Rock had an economic purpose, namely, the acquisition of a source of supply of good quality yarn, aside from any anticipated tax consequences. [4] Under these circumstances, we must conclude that the acquisition of the notes was not solely for the purpose of obtaining anticipated *311 tax benefits. The respondent further contends on brief that whether there were sales of the notes or retirements thereof, there was an element of original issue discount realized which constituted ordinary income, citing Real Estate Investment Trust of America, 40 T.C. 921, affd. (C.A. 1) 334 F. 2d 986. See also United States v. Midland-Ross Corporation, 381 U.S. 54, and section 1232(a)(2) of the Code. The respondent's position appears to be that at the time of the agreement of January 15, 1954, the obligations owing from High Rock to Susquehanna were worthless and that Susquehanna was willing to "forget and forgive" such obligations; that Susquehanna agreed to cast the transaction in the form of a sale of stock and the obligations, rather than a sale of only stock, solely for the purposes of the petitioner and his father; that therefore it should be considered that the demand notes were *312 issued directly from High Rock to the petitioner and his father; and that since there was no money advanced by them to High Rock in consideration therefor, it must be considered that the petitioner and his father received the demand notes at a discount. We cannot agree with this contention of the respondent. Irrespective of the value of the demand notes which were executed by High Rock to Susquehanna and then endorsed over to the petitioner and his father, the fact remains that they were executed in recognition of actual obligations owing as the result of monies advanced by Susquehanna to High Rock. Under these circumstances, we think it clear that there was no element of original issue discount at the time the demand notes were executed in 6 favor of Susquehanna. We cannot agree that the transaction as consummated is the same as if the notes had been issued by High Rock directly to the petitioner and his father without any consideration passing from them to High Rock. Rather, we think the form of the transaction must be recognized, namely, a purchase of the demand notes from Susquehanna. Indeed, the determination of the respondent in the notice of deficiency appears to be based *313 upon such premise. Hence, we see no justification under the circumstances for considering that there was any original issue discount realized by the petitioner upon the transfers of the notes to the bank. It is our conclusion that the gain upon the sales of the notes in question constituted long-term capital gain. Under the view we have taken the sales price of the note due June 30, 1957, was $15,264.81 and the sales price of the note due June 30, 1958, was $15,198.61. This will require a recomputation of the gain inasmuch as the respondent in his determination considered that the petitioner had received $15,500 from the bank upon each note. In addition it should be pointed out that the petitioner in its returns reported the sales price in each instance as $15,500, and claimed in each in stance the amount of the discount as an itemized deduction. Consistency requires that in the recomputation under Rule 50 these deductions claimed by the petitioner be disallowed. There has also been raised the question of the proper basis for the computation of the gain. In computing the gain with respect to each note, the respondent used in each case a basis of $1,011.82. In arriving at such basis, *314 he treated the amount of $10,000 paid by the petitioner and his father to Susquehanna as representing the cost of debts aggregating $153,189.33. This figure of $153,189.33 is apparently made up of the $93,189.33 face value of demand notes of High Rock which the petitioner and his father received from Susquehanna pursuant to paragraph 4.2(a) (ix) of the agreement and $60,000 representing the amount of another unsecured nonnegotiable promissory note of High Rock which the agreement, paragraph 4.2(a)(x), provided should be transferred by Susquehanna to the petitioner and his father. The petitioner contends that the respondent was in error in allocating any of such cost of $10,000 to notes other than those of a face value of $93,189.33, pointing out that the notes in the face amount of $60,000 were subject to offset to the extent that payments were made on the $320,000 face amount of notes which High Rock was required by the contract to issue directly to the petitioner and his father pursuant to loans made by them to High Rock. However, the agreement specifically states that the $10,000 was for all the indebtedness to be represented by the notes to be issued pursuant to both subparagraphs *315 (ix) and (x) of paragraph 4.2(a). Under the circumstances, we cannot conclude that the respondent was in error in his determination of the basis of the notes in question. On brief the petitioner contends that there was no gain whatever in the taxable years in question. His argument is that there was a taxable exchange in 1955 when the old demand notes were surrendered by the petitioner and the notes in question were received, and that this resulted in a basis for the notes equal to the face value thereof, which was paid by High Rock at maturity. No such issue was raised by the pleadings. In his petition the petitioner merely prayed that it be held that there is no deficiency and that his returns for the years in question be accepted as correct. We accordingly will not consider this issue raised for the first time on brief. F. H. Philbrick, supra. The remaining issue is whether the respondent erred in his determination that the petitioner received constructive dividends consisting of portions of automobile and entertainment expenses paid by a corporation owned by petitioner and his father. The petitioner was executive vice president of the corporation and used an *316 automobile owned by the corporation partly for personal purposes but principally for corporate purposes. The only evidence presented was the testimony of the petitioner. He stated that practically all of the use of the automobile was on behalf of the corporation, but that he could not say that there was not some mileage used personally. He further stated that there were no payments made to him by the corporation for entertainment which did not represent entertainment on behalf of the corporation. There was no detailed evidence as to amounts expended or the purposes of the various expenditures. The petitioner testified that of the amounts claimed by the corporation for automobile and entertainment expenses between 80 and 95 percent were allowed as deductions by the respondent. Thus, apparently the respondent determined that between 5 percent and 7 20 percent of such expenditures were paid by the corporation on behalf of the petitioner. The respondent's determination is presumed to be correct, and the petitioner has the burden of proving it to be wrong. Welch v. Helvering, 290 U.S. 111. Upon the record here presented we must conclude that the petitioner has not met *317 his burden of proving error in the respondent's determination, and such determination is approved. Decision will be entered under Rule 50. Footnotes
1. It was therein recited that at the time of the contract the total amount owing by High Rock to Susquehanna was $370,043.14, plus net advances made by Susquehanna to High Rock subsequent to July 31, 1953, not in excess of $30,000, that such obligations represented monies advanced by Susquehanna to High Rock, and that the entire amount thereof was then due.↩
2. The books and records of High Rock showed an excess of assets over liabilities of $204,357.72 at January 1, 1955, and that for the year 1955 it had operating profits of $83,002.79. Such books and records showed as of December 31, 1955, an excess of assets over liabilities of $287,557.54.↩
3. Section 1232 of the Internal Revenue Code of 1954 provides in part as follows: BONDS AND OTHER EVIDENCES OF INDEBTEDNESS. (a) General Rule. - For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof - (1) Retirement. - Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954). (2) Sale or exchange. - (A) General rule. - Except as provided in subparagraph (B), upon sale or exchange of bonds or other evidences of indebtedness issued after December 31, 1954, held by the taxpayer more than 6 months, any gain realized which does not exceed - (i) an amount equal to the original issue discount (as defined in subsection (b)), * * * shall be considered as gain from the sale or exchange of property which is not a capital asset. Gain in excess of such amount shall be considered gain from the sale or exchange of a capital asset held more than 6 months. * * * (b) Definitions. - (1) Original issue discount. - For purposes of subsection (a), the term "original issue discount" means the difference between the issue price and the stated redemption price at maturity. If the original issue discount is less than one-fourth of 1 percent of the redemption price at maturity multiplied by the number of complete years to maturity, then the issue discount shall be considered to be zero. * * * (2) Issue price. - * * * In the case of privately placed issues of bonds or other evidence of indebtedness, the issue price of each such bond or other evidence of indebtedness is the price paid by the first buyer * * *. (3) Issue date. - * * * In the case of privately placed issues of bonds or other evidences of indebtedness, the term "date of original issue" means the date on which each such bond or other evidence of indebtedness was sold by the issuer.↩
4. The respondent seems to argue that the acquisition of the stock of High Rock had as its principal purpose the obtaining of the benefit of net operating loss carryovers, but that question is not before us and we express no opinion with respect thereto.↩