MILTON J. SELIGMAN AND ESTATE OF FRANCINE SELIGMAN, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

FAYE S. HUTTON AND ESTATE OF C. HERBERT HUTTON, DECEASED, FAYE S. HUTTON, EXECUTRIX,[1] PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 16854–82, 17467–82.     Filed February 12, 1985.

---

[1]Faye S. Hutton and Estate of C. Herbert Hutton, Deceased, Faye S. Hutton, Executrix (the caption was changed on Aug. 27, 1982, in accordance with Rule 23(a)(1) of this Court's Rules of Practice and Procedure), docket No. 17467–82, was consolidated herewith for trial, briefing, and opinion.

*O. Jan Tyler* and *Carl Abramson*, for the petitioners.
*John W. Dierker*, for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in the petitioners' Federal income taxes for the taxable years as follows:

| Docket Nos. | 1978 | 1979 |
|---|---|---|
| 16854–82 | $21,583.14 | $14,130.78 |
| 17467–82 | 11,842.85 | |

After concessions by the parties, the issue for decision is whether petitioners[2] are entitled to deduct under section 162[3] certain administrative leasing expenses paid in connection with their computer leasing activities.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated herein by reference.

Petitioners Milton Seligman and Faye Hutton resided in Texas when they filed their petitions. Each of these petitioners is the executor/executrix of the respective spouse's estate. For the taxable years 1978 and 1979, the Seligmans filed joint Federal income tax returns with the Internal Revenue Service Center in Austin, Texas. For the taxable year 1978, the Huttons filed a joint Federal income tax return with the Internal Revenue Service Center in Austin, Texas.

During the taxable years 1978 and 1979, petitioner Milton Seligman was employed as a manufacturer's representative. Francine Seligman, his wife, did not work during these years. During the taxable year 1978, C. Herbert Hutton was retired.

---

[2] Although two of the petitioners are estates, we will use the term "petitioners," for purposes of simplicity, to refer both to the activities of the Seligmans and Huttons and their arguments on brief.

[3] All section references are to the Internal Revenue Code of 1954 and attendant regulations, as amended and in effect for the taxable years in issue and all Rule references are to this Court's Rules of Practice and Procedure.

Petitioner Faye Hutton, his wife, worked as a secretary/bookkeeper for the law firm of Sands & Tyler.

In 1976, Financial Marketing Services, Inc. (FMS), whose principal place of business is in Norcross, Georgia, was organized to engage in the business of buying and leasing computer equipment and selling equipment lease packages to investors. Jack Camarda (Camarda) is FMS's sole stockholder and previously was a financial marketing manager for Honeywell Information Systems, Inc. (Honeywell). In late 1977, FMS entered into negotiations with Best Products (Best) of Richmond, Virginia, concerning Best's use of Honeywell computer equipment. At that time, Best was leasing Honeywell computer equipment from FNC Leasing Co. (FNC), a wholly owned subsidiary of Fulton National Bank of Atlanta, and Citco Leasing Corp. (Citco), a wholly owned subsidiary of Citicorp Bank of New York. Best desired to upgrade its computer system and FMS wanted to purchase new Honeywell equipment and lease it to Best. Best, however, also desired to have FMS remove the unwanted Honeywell computer equipment and terminate Best's financial responsibility with respect to it.

During Camarda's employment with Honeywell, he became acquainted with O. Jan Tyler (Tyler), who is currently with the law firm of Sands & Tyler, because of Tyler's purchase and lease of Honeywell computer equipment to third parties. In 1976 and 1977, Tyler and Camarda worked together on several leveraged computer leasing transactions.

Omega Leasing Co. (Omega) is a Texas corporation which was initially organized as a partnership in 1971 and subsequently incorporated in 1973. During its partnership stage, it comprised five corporations, each having a 20-percent interest therein. Upon incorporation, each of the five corporations acquired a 20-percent equity interest in Omega. Since incorporation, Tyler has served as Omega's only president. Omega's business activities have included the purchase of Honeywell equipment and its leasing to third-party users. Prior to 1978, Omega also sold equipment lease packages.

Manmark Co. (Manmark), a corporation, was organized in 1975 to engage in the marketing and management of computer equipment leases. Tyler served as its president and acts as trustee for the beneficial owner of its stock, but he does not have, or claim, any beneficial ownership in any of its stock.

In early 1978, FMS began negotiating with Continental Trailways Bus System (Trailways) of Dallas, Texas, concerning its use of Honeywell computer equipment. Camarda desired to lease Best's unwanted Honeywell computer equipment to Trailways until Trailways acquired new equipment. Camarda contacted Tyler and proposed that an investor be found to purchase the computer equipment currently leased by Best from the two leasing companies and to lease the equipment to Trailways. The proposed sales price was approximately $2 million. Tyler felt difficulties would be encountered in locating a single investor who could purchase the $2 million package. Camarda then suggested that the equipment be divided into smaller packages for sale to numerous owners who would, in turn, lease the equipment to Trailways with FMS acting as an intermediary.

FMS eventually entered into contracts to purchase the Honeywell computer equipment currently leased by Best from FNC and Citco for a total purchase price of approximately $1,700,000. FMS then sold this equipment to Omega for $1,955,000, payable $255,000 in cash and $1,700,000 in nonrecourse promissory notes. The $1,700,000 indebtedness consisted of 17 notes of $85,000 each and one note of $255,000. FMS also divided the Honeywell computer equipment into 17 packages having a value determined by FMS of approximately $100,000 each and one package having a value of approximately $300,000.

Omega sold each $100,000 package to individual purchasers (including the Seligmans and Huttons) for a $15,000 cash downpayment and subject to $85,000 of the nonrecourse indebtedness to FMS. The $300,000 package was sold for a $45,000 cash downpayment and subject to $255,000 of the nonrecourse indebtedness to FMS. Monthly payments on each of the nonrecourse notes of $85,000 did not exceed $1,380.

Each equipment package purchaser entered into a 41-month equipment lease with FMS. Monthly lease payments of $1,460 were specified for each $100,000 equipment package. Further, according to the terms of the master equipment lease, each lessor also agreed "to pay Manmark Company a leasing commission and administrative handling fee in the amount of $225 a month for the first twelve [12] months of this lease."

The "leasing commission and administrative handling fee[s]" paid to Manmark by petitioners entitled them to miscellaneous administrative leasing services over the 41-month terms of the leases. Each month Manmark collected the lease payments and remitted the payments on the nonrecourse notes to FMS.[4] Each quarter Manmark remitted to petitioners the excess of the lease payments over the payments on the notes. Annually Manmark prepared and mailed tax information statements to petitioners indicating the total lease payments received, interest paid, administrative expenses incurred, and relevant depreciation information.

Petitioners reported these computer leasing activities on their joint Federal income tax returns as follows:

| Petitioners | Year | Income | Depreciation | Interest | Administrative expense |
|---|---|---|---|---|---|
| Seligman | 1978 | $8,760 | $21,248.00 | $3,862.00 | $1,350 |
|  | 1979 | 17,520 | 17,732.58 | 7,087.04 | 1,350 |
| Hutton | 1978 | 8,760 | 7,142.85 | 3,862.19 | 1,350 |

For the taxable years 1978, the Seligmans and Huttons claimed $8,873.94 and $10,000, respectively, of investment tax credit concerning their respective $100,000 computer equipment packages that they purchased from Omega.

For the taxable year 1978, the Commissioner disallowed $954.90 of the $1,350 of administrative expense deductions claimed by the Huttons with respect to the $100,000 computer equipment package purchased from Omega. The Commissioner determined that such administrative fees "represent a capital expenditure and must be allocated over the 41 [month] term of the lease"; hence, only $395.10 of the deductions were permitted. The Commissioner also disallowed the $10,000 investment tax credit claimed by the Huttons because, as noncorporate lessors, they failed to satisfy the 15-percent test of section 1.46–4(d)(3), Income Tax Regs.

For the taxable years 1978 and 1979, the Commissioner disallowed the $1,350 of administrative expense deductions claimed by the Seligmans for each year because "it has not been established that any amount in excess of that allowed is an ordinary and necessary expense incurred or paid in the

---

[4]The record is unclear whether this facet of Manmark's administrative activities involved the actual exchange of funds with FMS or was merely accomplished by offsetting book entries.

production of income, was expended, or was expended for the designated purpose."[5] The Commissioner also disallowed the investment tax credit claimed by the Seligmans with respect to their $100,000 computer equipment package due to their failure to establish "any basis in any qualifying Section 38 property acquired and placed in service during 1978."

At trial, respondent sought leave to amend his answer in docket No. 16854–82 (Seligman) pursuant to Rule 41(a), and petitioners timely objected on general grounds. In the ensuing colloquy, respondent made the following representations concerning his proposed amendment:

All the theory that is raised in the Seligman case by the new amendment to answer is already contained in the statutory notice on all of the cases. It is contained as an additional theory in two of the cases, but we are going to enter into stipulations regarding the disposition of four other cases, other than the ones that are being tried here this morning. And all of those cases will rely upon the Court's decision in the case in which this theory is raised in the statutory notice. That is the Hutton case.

This Court thereafter granted respondent leave to amend his answer over petitioners' objections. In his amended answer, respondent alleged "that allowable I.R.C. § 162 deductions for the first 12 months of the lease of the investment tax credit property do not exceed 15% of the rental income produced by such property during the first 12 months of the lease."

OPINION

The issue for decision is whether petitioners are entitled to deduct under section 162 certain administrative leasing expenses paid in connection with their computer equipment leasing activities. The determination of whether such expenses are deductible under section 162 or whether these expenses must be capitalized and amortized also directly affects petitioners' claimed investment tax credit because section 46(e)(3), which sets forth special limitations concerning noncorporate lessors, specifically provides that:

---

[5]Respondent has apparently conceded in his briefs that these petitioners did, in fact, incur $1,350 of administrative expenses during the taxable years in issue.

(3) NONCORPORATE LESSORS.—A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if—

    (A) the property subject to the lease has been manufactured or produced by the lessor, or

    (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee *the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162* (other than rents and reimbursed amounts with respect to such property) *exceeds 15 percent of the rental income produced by such property.*[6] [Emphasis added.]

In his opening brief, respondent asserts several alternate theories to support his position that petitioners are not entitled to the investment tax credit because they have failed to satisfy the requirements of section 46(e)(3)(B). First, respondent contends that petitioners' monthly payments to Manmark are not deductible under section 162 because petitioners failed to establish that these sums were paid in connection with the carrying on of a trade or business. For his second argument, respondent asserts that petitioners' monthly payments to Manmark are not allowable section 162 expenses *"with respect to"* the leased computer equipment as section 46(e)(3)(B) requires. Finally, respondent contends that "The administration fees, even if considered 'allowable section 162 expenses with respect to the leased property,' must be nonetheless allocated over the 41 month period of the lease because Manmark provided its services for this whole period."

Petitioners retort that respondent's first two contentions (i.e., allegations that petitioners were not involved in the carrying on of a trade or business or that the administrative expenses were not allowable 162 expenses "with respect to" the leased property) were first presented in respondent's opening brief as they were not raised in either the statutory notices mailed to petitioners or in the pleadings. In light of this procedural history, petitioners, claiming surprise, contend

---

[6]As petitioners do not contend that they manufactured or produced the computer equipment they ultimately leased, they are entitled to investment tax credit only if they satisfy the requirements of sec. 46(e)(3)(B). The capitalization of the monthly administrative fees paid by petitioners to Manmark during the first 12 months of their leases and amortization over the 41-month terms of the leases under sec. 167 would effectively deny petitioners investment tax credit as they would be unable to satisfy the 15-percent test set forth in sec. 46(e)(3)(B).

that the Court should disregard such grounds, but if such grounds are considered, that respondent should bear the burden of proving them to be correct under Rule 142(a).

Although this Court possesses the inherent authority to sustain respondent's determination for reasons other than those assigned in his notice of deficiency (*Estate of Horvath v. Commissioner*, 59 T.C. 551, 555 (1973)), this should not be interpreted to afford respondent carte blanche authority to assert additional bases for his disallowance of specific items at any time prior to the issuance of an opinion. The common law practice of trial by surprise is an anathema to this Court. Rule 31(a) specifically provides that "The purpose of the pleadings is *to give the parties and the Court fair notice of the matters in controversy and the basis for their respective positions.*" (Emphasis added.)

Respondent is normally afforded as many as three distinct opportunities to assert specific reasons for the disallowance of deductions or credits on a Federal tax return. His initial option arises in the mailing of the notice of deficiency and his determinations therein are normally clothed with a presumption of correctness. *Welch v. Helvering*, 290 U.S. 111, 115 (1933). He may, in addition, assert new grounds for disallowance in his answer or in an amendment to his answer. Yet, as the U.S. Court of Appeals for the Eighth Circuit so aptly observed in *Commissioner v. Transport Mfg. & Equip. Co.*, 478 F.2d 731, 736 (8th Cir. 1973), affg. 57 T.C. 469 (1971), which involved a tardy assertion of a section 482 issue:

the longer the Commissioner delays in not expressly advising the taxpayer of the intended theories, the more reason there is to conclude that the taxpayer has not received fair notice and has been substantially prejudiced so as to deny the Commissioner consideration of theories raised for the first time in post trial briefs. The Commissioner may avoid this uncertainty and discharge his duty of informing the taxpayer by expressly notifying the taxpayer of the intended theories in the deficiency notice and the Commissioner's answer.

It is not surprising, therefore, that this Court has consistently refused to consider issues first raised in the parties' briefs when surprise and prejudice are found to exist.[7] *Robertson v.*

---

[7] In the absence of surprise and prejudice, this Court will consider such matters. *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. 601, 617 (1964).

*Commissioner,* 55 T.C. 862, 865 (1971); *Philbrick v. Commissioner,* 27 T.C. 346, 353 (1956); *Hettler v. Commissioner,* 16 T.C. 528, 535 (1951); *Wentworth Manufacturing Co. v. Commissioner,* 6 T.C. 1201, 1208 (1946).

In the instant case, petitioners were clearly surprised and prejudiced by respondent's attempt to assert in his opening brief two additional bases to support his disallowances of petitioners' claimed administrative expense deductions.[8] Respondent's post-trial contention that petitioners failed to establish that they were engaged in the trade or business of leasing computer equipment denied them the opportunity to present evidence on this issue because the pleadings did not alert them to this contention. The same can be said with respect to respondent's post-trial assertion that the claimed administrative expenses were not section 162 expenses "with respect to" the leased equipment. Further, raising new issues for the first time on brief also deprives the Court of complete argument and research of such contentions in the parties' opening and reply briefs. Accordingly, we will not consider these issues first raised in respondent's opening brief. *Robertson v. Commissioner, supra; Philbrick v. Commissioner, supra; Hettler v. Commissioner, supra.*

From these preliminary matters, we now turn to the ground for disallowance based upon capitalization. In docket No. 16854–82 (Seligman), respondent was granted leave to amend his answer to assert the disallowance position raised in docket No. 17467–82 (Hutton). Although the language in respondent's amended answer in docket No. 16854–82 (Seligman) disallowing the petitioners' administrative expense deductions differs from that set forth in the notice of deficiency in docket No. 17467–82 (Hutton), respondent now generally argues in both cases that petitioners' claimed administrative expense deductions should be capitalized and amortized over the 41-month terms of the computer leases.[9] In docket No. 16854–82 (Selig-

---

[8]Neither of the notices of deficiency or answers even tangentially raised these issues. Further, in respondent's representations to this Court at trial concerning his motion to amend his answer in docket No. 16854–82 (Seligman), he specifically stated that the amendment was only adding the capitalization issue set forth in the notice of deficiency in docket No. 17467–82 (Hutton).

[9]Although respondent is apparently willing to concede that the administration fees are allowable sec. 162 expenses which, nevertheless, must be allocated over the 41-month lease terms, *supra* at page 197, this proration argument differs materially from the capitalization issue. The proration of prepaid expenses to a subsequent taxable period necessarily requires the successful application of sec. 446(b), i.e., a determination that the taxpayer's method of accounting "does [not]

man), this constitutes a new matter; hence, respondent bears the burden of proving his position to be correct. Rule 142(a).

Petitioners contend that the fees paid by them to Manmark as administrative handling fees are deductible when paid pursuant to section 162. According to petitioners, these payments were scheduled to be made by each lessor during the time period Manmark contemplated that it would be rendering most of the services, and this was in accord with the custom, experience, and business practice of the industry. Further, these payments were made when Manmark, in fact, rendered most of the services to petitioners. Finally, citing several intangible drilling cost cases and revenue rulings, petitioners assert that although these fees are deductible when paid, on the ground that most of the services were then rendered, the presence of nominal services to be rendered in the future does not, per se, render them nondeductible.

In support of respondent's position that the 12 monthly administrative fees paid by petitioners to Manmark must be capitalized and amortized over the 41-month term of the computer equipment lease, he observes that Manmark's rendition of administrative services to petitioners extended over the entire term of the lease. Throughout the term of each lease, Manmark furnished investors quarterly statements setting forth lease income received and the payments on the debt. A check representing the amount of the excess income over loan repayments was also remitted to investors quarterly. Further, Manmark mailed annual letters to its investors setting forth applicable tax information. Although respondent concedes that some administrative duties during the early portion of the term of the lease were more extensive than those later performed, he argues that these additional duties were largely incidental to loan repayments and rendition of cash-flow

clearly reflect income." *Van Raden v. Commissioner,* 71 T.C. 1083 (1979), affd. 650 F.2d 1046 (9th Cir. 1981). The attendant capitalization issue, on the other hand, concerns whether the expenditures constituted ordinary and necessary business expenses or created a capital asset. *Commissioner v. Lincoln Savings & Loan Association,* 403 U.S. 345 (1971). Sec. 446(b) imposes a burden of proof upon the taxpayer to demonstrate that the Commissioner abused his discretion in changing the taxpayer's accounting method. The burden on petitioner to prove that the Commissioner abused his discretion is heavy. *Resnik v. Commissioner,* 66 T.C. 74, 78 (1976), affd. 555 F.2d 634 (7th Cir. 1977). That burden of proof is heavier than merely proving that the determination of the Commissioner is erroneous. As petitioners were not alerted to respondent's assertion of the sec. 446(b) argument by either the notices of deficiency or pleadings and, therefore, presented no evidence or argument concerning this matter, we will not consider it. *Robertson v. Commissioner,* 55 T.C. 862, 865 (1971); *Philbrick v. Commissioner,* 27 T.C. 346, 353 (1956).

statements and quarterly statements which constituted a significant portion of Manmark's services in consideration for the 12 monthly payments of $225. In light of this record, respondent asserts that because the last lease payment benefited from the services as much as the first payment, the monthly fees paid by petitioners at the beginning of the 41-month lease should be allocated over the entire lease term. He also directs our attention to section 1.461–1(a), Income Tax Regs., which provides for the amortization of business expenses which result in the creation of an asset which has a useful life substantially in excess of 1 year. In the immediate cases, respondent asserts that the "asset" created is the right to certain administrative services over a 41-month term.

Although some courts and parties would have us believe otherwise, there is no precise line of demarcation separating business expenditures currently deductible under section 162(a) and those which constitute nondeductible capital expenditures within the scope of section 263. *Iowa-Des Moines Nat. Bank v. Commissioner*, 68 T.C. 872, 878 (1977), affd. 592 F.2d 433 (8th Cir. 1979); *Boagni v. Commissioner*, 59 T.C. 708, 712 (1973).

The principal function of the term "ordinary" in section 162(a) is to differentiate between expenditures which are currently deductible and those which are capital in nature. *Commissioner v. Lincoln Savings & Loan Association*, 403 U.S. 345, 353 (1971). Generally, expenditures to acquire assets or secure benefits which last beyond the taxable year must be capitalized. Sec. 1.263(a)–2(a), Income Tax Regs.; *United States v. Mississippi Chemical Corp.*, 405 U.S. 298, 310 (1972); *Central Texas Savings & Loan Association v. United States*, 731 F.2d 1181, 1183 (5th Cir. 1984); *Uecker v. Commissioner*, 81 T.C. 983, 995 (1983), on appeal (5th Cir., July 17, 1984); *Otis v. Commissioner*, 73 T.C. 671, 674 (1980), affd. without published opinion 665 F.2d 1053 (9th Cir. 1981). The mere presence of some possible future benefit from an expenditure, however, is not determinative. *Commissioner v. Lincoln Savings & Loan Association, supra* at 354.

When the immediate facts are reviewed in the context of these nebulous principles, the capital nature of petitioners' administrative expense payments to Manmark is quite apparent. These administrative expenditures, which were made by

both the Seligmans and Huttons over the first 12 months of the 41-month terms of the computer leases, created separate and distinct assets for petitioners, i.e., the right to have various administrative duties performed for them during the entire 41-month periods. *Commissioner v. Lincoln Savings & Loan Association, supra.* During the term of the lease, Manmark periodically collected lease payments from the lessee and made payments on the nonrecourse notes. Further, Manmark each quarter remitted to petitioners the difference between the lease income and payments on the notes. Finally, Manmark annually prepared and mailed to petitioners relevant tax information covering that year's computer equipment leasing activities. The fact that these expenditures created a separate and distinct intangible asset, i.e., the legally enforceable right to receive certain administrative services in the future, instead of a tangible asset, does not warrant a different conclusion. *Central Texas Savings & Loan Association v. United States, supra* at 1185.

Petitioners' contentions that their administrative expense payments to Manmark were scheduled during the time period that Manmark contemplated that it would be rendering most of the services and that most of Manmark's services were, in fact, rendered during the first 12 months of the 41-month computer equipment leases is not supported by the record. Mr. Tyler testified that computer equipment lessors frequently encounter difficulties in getting into the lessee's accounts payable routine in the early term of a lease. This problem, however, is largely imaginary in the instant setting because Mr. Tyler and the lessee, FMS, had worked closely together on several other computer equipment leasing transactions, and FMS's principal, Mr. Camarda, undoubtedly understood the necessity for prompt lease payments. Any additional services provided by Manmark only at the beginning of the term of the lease were clearly nominal and do not support the current deductibility of the administrative expenses when weighed against the recurring periodic administrative services provided over the entire 41-month period. Further, we found Mr. Tyler's testimony concerning the custom and practice of the computer leasing business to be evasive and entitled to little weight because of his pecuniary interest in the outcome of

these cases.[10] Petitioners' remaining witnesses, who were also in the computer leasing business, were no more convincing concerning the custom and practice of this business as some of them testified that they capitalized similar administrative expenses. Finally, petitioners' citation of cases and revenue rulings pertaining to intangible drilling costs is inapposite as these costs are admittedly capital in nature and are currently deductible only to the extent elected under section 263(c). *Sun Co. v. Commissioner*, 74 T.C. 1481 (1980), affd. 677 F.2d 294 (3d Cir. 1982); *Gates Rubber Co. v. Commissioner*, 74 T.C. 1456 (1980), affd. 694 F.2d 648 (10th Cir. 1982); *Standard Oil Co. (Ind.) v. Commissioner*, 68 T.C. 325 (1977). Accordingly, petitioners must capitalize the administrative expenses paid to Manmark and may recover their costs by amortizing them over the 41-month period of their computer equipment leases. Petitioners, therefore, also are not entitled to the investment tax credit with respect to their computer equipment packages as they have failed to satisfy the 15-percent requirement of section 46(e)(3).

> *Decision will be entered under Rule 155 in docket No. 16854–82.*
>
> *Decision will be entered for the respondent in docket No. 17467–82.*

---

[10]Mr. Tyler simultaneously served as president of both Omega and Manmark. Further, the law firm in which he was a member issued written opinions to investors expressing the view that the administrative expense payments were currently deductible and that the computer equipment lease packages entitled the investors to the investment tax credit.