PANO ANASTASATO AND JANICE ANASTASATO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; PANMARC, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Anastasato v. Commissioner
Docket Nos. 14631-81, 14632-81.
United States Tax Court
T.C. Memo 1985-101; 1985 Tax Ct. Memo LEXIS 532; 49 T.C.M. (CCH) 893; T.C.M. (RIA) 85101; March 6, 1985. Alan H. Levine, for the petitioners. Jack H. Klinghoffer, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION "KORNER, Judge: In these consolidated cases, respondent determined deficiencies in Federal income tax *533 and additions to tax against petitioners as follows: Taxable year
Additions to tax
Petitioner
Ended
Deficiency [1]
Sec. 6653(b) [2]
Pano Anastasato and
12/31/74
$350,037.00
[3] $175.018
Janice Anastasato
12/31/75
[4] 279,588.00
[3] 139,794
Docket 14631-81
12/31/76
[4] 3,843.99
[3] 1,921
Total
$633,468.99
$316,733
Panmarc, Inc.
3/31/74
$49,667.00
$24,833
Docket 14632-81
3/31/75
426,081.00
213,040
3/31/76
164,938.00
82,469
Total
$640,686.00
$320,342
*534 The issues for decision are: (1) Whether respondent's determination of the above-mentioned deficiencies was arbitrary, thus shifting the burden of going forward with the evidence to respondent, or whether his statutory notices enjoy their usual presumption of correctness; if the latter, whether petitioners have demonstrated error therein; (2) whether respondent's claim of additional unreported income in both dockets is correct; (3) whether respondent has established by clear and convincing evidence that any underpayment of income tax was due to petitioners' fraud with intent to evade tax under section 6653(b); and (4) whether the assessment of respondent's determinations in Docket 14632-81 is barred by the effective statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. At the time of the filing of their petition herein, Pano Anastasato's (hereinafter "Pano") address was in St. Croix, U.S.Virgin Islands, and Janice Anastasato (hereinafter "Janice") resided in Ft. Lauderdale, Florida. [5] Pano and Janice filed joint Federal income tax *535 returns for the calendar years 1974 through 1976. The petitioner in docket No. 14632-81 is Panmarc, Inc. (hereinafter "Panmarc"), a New York corporation, with its principal office in New York City. Panmarc filed Federal income tax returns for its taxable years ended March 31, 1974, March 31, 1975, and March 31, 1976, on September 16, 1974, September 10, 1975, and September 16, 1976, respectively. Pano has been involved in various areas of the travel business since 1954. In 1960, after leaving his employment with Alitalia Airlines, Pano established his own travel agency and tour operation business under the names Panmarc and Wholesale Tours International (hereinafter "WTI"), respectively. During the years 1974 through 1976, Pano was a 100 percent shareholder of both WTI and Panmarc and president of Panmarc. Pano's operation was not huge, measured by wide industry standards, but was very substantial in his particular segment of the market. WTI was in the business of packaging, promoting, and marketing travel tours. During the early sixties, Pano approached various airlines, including KLM Royal Dutch *536 Airlines (hereinafter "KLM"), and proposed to them a plan designed to promote the sale of tours to the Bible Lands of Lebanon, Jordan and Egypt. Pano offered to use his expertise to instruct the airlines on how to use their advertising, marketing, and promotional resources to encourage ministers throughout the United States to recruit their parishioners to go on these tours. Pano's idea appealed to KLM's management and an initial promotional effort was made whereby KLM mailed letters to ministers advertising the tours to the Bible Lands, followed by brochures and other correspondence, meetings, seminars, presentations and sales training sessions. The effort was successful to a degree far beyond KLM's expectations. Panmarc was licensed to write tickets for international air travel, viz., to purchase tickets directly from the airlines, by the International Air Transport Association (hereinafter "IATA"), a trade association of international carriers. The tickets for WTI's customers were purchased through Panmarc. In order to control the already fierce competition amongst international carriers, IATA established a system of regulations limiting the amount of commissions payable *537 to travel agents and the support that could be extended to tour operators. These regulations were in effect until 1976; the maximum commission allowed by IATA on the sale of airline tickets in tour packages was 10 percent of the ticket price.[6] Compliance with this private system was not required by United States law. It was a widespread practice in the airline industry for airlines to pay commissions in excess of those permitted by IATA (hereinafter referred to, interchangeably, as "overrrides" or "override commissions"). [7] The overrides were extra commissions which were not required to be paid and were aggressively negotiated for on both sides. Override commissions were paid as a means to encourage travel agents and tour operators to generate more business for the airlines. IATA imposed severe sanctions on air carriers who paid, and on travel agents and tour operators who received, commissions or other forms of compensation in excess of the amounts allowed by the regulations, including monetary fines and the deprivation of the right to act for air carriers *538 which were members of IATA. Thus, the strictest confidentiality was required and expected of travel agents and tour operators with respect to the payments of overrides. KLM was amongst the airlines paying such override commissions. [8]
Bohdan Huzar was employed as a special agent by the Internal Revenue Service from 1972 to January 1982. Huzar's responsibilities included investigating any potential criminal violations of the Internal Revenue laws of the United States. Huzar received an information item from the Federal Trade Commission for his evaluation and consideration. The document reportedly contained information about the alleged receipt of unreported overrides by Pano. [9] After studying the document, Huzar requested that the case be assigned to him for further investigation. In the conduct of his investigation, Huzar *539 issued summonses to Pano's various companies for examination of the financial books and records and to various banks for the records of Pano's accounts. Pano or his attorneys instructed various financial institutions not to comply with the summons request; thus, Huzar could not obtain all the financial records covered by the summonses. Huzar summoned Pano to appear at the offices of the Internal Revenue Service. Pano appeared, accompanied by his attorney, proceeded to identify his tax returns and declined to answer relevant questions put to him based on his constitutional privilege under the Fifth Amendment. [10] Huzar then requested Pano to provide him with a copy of his passport and an exemplar of his writing.
Examination of the books and records of Pano's businesses reflected that Panmarc did substantial business with KLM. Thus, Huzar decided to focus on petitioners' transactions with KLM and, accordingly, summoned documents containing information related to the purported *540 payments to Pano or to his companies by KLM. Huzar also met with Paul Mifsud, general counsel to KLM in the United States, on January 9, 1980. Mifsud provided Huzar with a scheduled list or summary of all the payments that were allegedly made to Pano from overseas sources. The purported payments were made before the commencement of Mifsud's employment with KLM in April 1976. Upon Huzar's request to provide him with copies of the actual documents, arrangements were made for Huzar to have access to the documents in The Netherlands. Huzar arrived in The Netherlands on March 4, 1980, and was met by Hans Berthold Gimm, an agent with the Office of International Operations of the Internal Revenue Service stationed in Bonn, West Germany. The next day, March, 5, 1980, Huzar and Gimm went to KLM's headquarters in Amstelveen, a suburb of Amsterdam, where they met with Mifsud and one Westpladt, an employee in the accounting department of KLM. Westpladt showed Huzar documents allegedly related to the override payments, including: (1) Debit advice issued to KLM by Bank Leu, Ltd. (hereinafter "BL") in Zurich, Switzerland, indicating that $100,000 had been transferred out of KLM's account *541 and into account no. 80659 AR, Code GIGE, with the Swiss Bank Corporation (hereinafter "the SBC account") in Geneva, Switzerland on February 19, 1974; (2) debit advice issued to KLM by BL indicating that $141,008.59 had been transferred from KLM's account to the SBC account on September 19, 1974; (3) debit advice issued to KLM by BL indicating a transfer of $150,000 from KLM's account to the SBC account on October 7, 1974; (4) debit advice issued to KLM by BL indicating that $300,000 had been transferred from KLM's account to the SBC account on December 13, 1974; (5) debit advice issued to KLM by BL indicating that $300,000 had been transferred from KLM's account to the SBC account in March 1975; (6) debit advice issued to KLM by the Pierson, Heldring & Pierson N. V. Bank in Amsterdam indicating that $350,000 had been transferred from KLM's account to the SBC account on August 21, 1975; (7) cash paid out slip in the amount of $6,000 dated October 10, 1975, allegedly signed by Pano; (8) cash paid out slips in the amounts of $4,000, $4,000, $1,000, $1,500 and $1,000 dated January 30, 1976, March 1, 1976, April 13, 1976, July 6, 1976 and September 3, 1976, respectively, allegedly signed *542 by Pano; and (9) KLM's stationary dated July 29, 1976, acknowledging receipt of a cash payment of $1,500, allegedly signed by Pano. According to Huzar's report, Westpladt informed him that Pano had received an additional cash payment of $7,000 on July 23, 1975, for which he did not have a cash paid out slip at the moment, for total cash payments of $13,000 in 1975 and $13,000 in 1976. The cash payments were reportedly made to Pano at KLM's office in New York. Huzar requested Mifsud to provide him with copies of all the aforementioned documents. Westpladt also stated, according to Huzar's report, based on a memorandum from KLM's sales and marketing force in New York City pertaining to calendar year 1970, that KLM had agreed to pay Pano approximately 7 percent over and above the normal commission that was being paid. [11] The additional 7 percent would be, allegedly according to the memorandum, an incentive to be paid to Pano quarterly in Swiss francs to an account with a Swiss bank. Each year the agreement was to be reviewed and modified if necessary. The memorandum also allegedly stated that as of 1975 Pano was receiving semi-annual payments totality approximately 15 percent *543 of the ticket price, based on total traffic volume, excluding charters, as overrides. Westpladt stated, according to Huzar's report, that he did not know whether the SBC account was Pano's personal account, but that it was the account to which Pano had instructed KLM to deposit the override payments. In writing his report, Huzar relied on the transcripts made by him of the aforementioned documents and on the information provided by Westpladt. [12] Huzar submitted his report to respondent's District Counsel for review; a decision was made not to recommend criminal prosecution of the case. Soon afterwards, Huzar was contacted by the Securities and Exchange Commission (hereinafter "SEC") and was told that additional documents had been obtained from KLM. Huzar had access to these documents, included among which was a "Response to SEC April 1, 1980 Inquiry." [13] Copies of the documents requested by Huzar were obtained by the Internal Revenue Service after Huzar left his employment. *544 In issuing the deficiency notices herein, respondent relied on the special agent's investigation, the documents obtained from KLM, the documents provided by the SEC, the books and records of Panmarc and WTI, and interviews with various persons, some of whom testified herein.Respondent determined that the amounts allegedly deposited to a Swiss bank account and the various cash payments supposedly received by Pano were receipts of Panmarc. Respondent determined, further, that the above-mentioned amounts had been distributed and were constructive dividends to Pano, to the extent of Panmarc's earnings and profits. The portion of the distribution in excess of the amount of Panmarc's earnings and profits was applied against and reduced Pano's adjusted basis in the Panmarc stock to zero; the excess of the distribution over Pano's adjusted basis in the stock was taxed as long-term capital gains. Thus, respondent determined that petitioners failed to report taxable income in the following amounts: Taxable Year
Petitioner
Ended
Amount
Panmarc
March 31, 1974
$100,000
March 31, 1975
891,009
March 31, 1976
371,000
Constructive
Capital
Petitioner
Taxable Year Ended
Dividends
Gains
Pano and
December 31, 1974
$421,870
$124,067
Janice
December 31, 1975
151,350
259,825
December 31, 1976
5,000
*545 Respondent issued statutory notices of deficiency accordingly on April 15, 1981 to petitioners, with deficiencies and additions to tax as indicated above. By petitions filed on June 19, 1981, petitioners contested the foregoing determinations. In their replies to respondent's answers, [14] petitioners admitted that KLM had paid the amount of $13,000 in 1975 and $13,000 in 1976 directly to Pano, but denied that the payments were income either to Pano or Panmarc. At the trial of these matters the Court heard testimony from seven witnesses: Huzar and John Bolger, revenue agents, Andre Luber, Assistant Manager for Passenger Sales of KLM in the United States; Gabriel Warshawsky, former employee of WTI; Margaret Reischental, accountant for WTI and Panmarc; Paul Mifsud, General Counsel of KLM in the United States, and Pano. In 1970, Arne Duyf, then Manager for Passenger Sales of KLM in the United States, [15] and Pano began discussions regarding the possible payment of overrides by KLM. Duyf and Pano met several times during the course of these negotiations; the meetings would usually take place at KLM's offices in New York City. Charles Bulterman, *546 Assistant Manager for Passenger Sales of KLM in the United States and Duyf's right hand man, was often present and participated in the negotiation process. Duyf made it clear to Pano that the payment of overrides was conditioned upon Pano's promise that such payments would not be disclosed to any United States agency or to IATA. KLM was apparently concerned about its possible liability for large monetary fines to IATA should it be found to have paid overrides. In 1973, Bulterman was promoted to the position of Manager for Passenger Sales of KLM in the United States. Andre Luber was appointed Assistant Manager for Passenger Sales of KLM in the United States. Luber was responsible for negotiating override commissions on behalf of KLM. Travel agents and tour operators would usually approach Luber with a proposal or request *547 for overrides, consistent with their desire to obtain the most beneficial bid for their business from the air carriers. Luber would apprise them of KLM's standpoint with respect to their proposals and make counter proposals; a tentative agreement would then usually be reached. This tentative, initial agreement would then be reduced to writing and given to Bulterman for his approval. Upon Bulterman's approval, all the documentation pertaining to the agreement would be given to the accounting department and the details of the agreement expressed as answers to a questionnaire or "vragenlijst." The purpose of these questionnaires was to give the KLM management a full scope of the agreements reached with the travel agents and tour operators. Any changes to the original agreement would be reflected as a change to the questionnaire or "wijziging vragenlijst." Changes to the questionnaires were required when the economics of the situation changed. The questionnaires, together with any changes or amendments thereto, would be sent to KLM's head office in Amstelveen with a recommendation for final approval and payment. The head office would then make a determination as to whether the terms *548 of the agreement were in line with company policy. Upon a determination that the agreement exceeded the guidelines set by the head office regarding the amount of override payments that could be paid, the agreement would be disapproved and returned to the KLM office in New York. If the agreement was found to be in line with the guidelines set by the head office, the questionnaires would then be registered with the Central Department of The Netherlands' office and an order issued to the Finance Department that the monies by paid in the manner prescribed by the agreement. Pano approached Luber in 1973 with a request for additional commissions and negotiations between them ensued; additional negotiations took place during the years 1974 and 1975. Bulterman was sometimes present during the negotiations. Also present was Gabriel Warshawsky (hereinafter "Gabriel"). Gabriel was employed by WTI in 1970 and started negotiating for overrides in 1973; his participation continued until 1975, when he left his employment with WTI. During 1974 and 1975, Gabriel was Executive Vice President of WTI and Pano's number two man. Another WTI employee, Ray Masillo was sometimes present during the *549 negotiations. An agreement was reached covering the period from April 1974 to December 1974. Payments were to be made in the amount of 15 percent computed on the net on line value -- that portion of the ticket flown on KLM -- of every ticket sold. Extra commissions would be paid for ad hoc groups, viz., groups for which extra commissions were required because of competitive elements or routing absorptions of hotel and bus costs; these amounts were to be negotiated separately. From January 1975 to March 1975 the agreement was to pay the general commissions plus 21 percent. Neither Luber nor Gabriel knew whether the payments were actually made. Pano was always complaining that KLM was not paying. During mid-May 1975, Luber was approached by Gabriel and Masillo, the agreement was renegotiated and they agreed, among other things, that for the period from April 1, 1975 through October 31, 1975 payments would be made in the amount of 18 percent on the net on line value of every ticket sold. This agreement was approved by Bulterman. During 1974 and 1975, the amount of turnover (i.e., the value of tickets sold for carriage on KLM) on the basis of which negotiations were made was *550 in excess of $4 million. In September 1975, KLM and the SEC entered into a consent decree prohibiting passenger rebates, viz, refunds to any purchaser of passenger air transportation of portions of the amount received as payment for the tickets. An agreement with KLM was reached for the period from February 20, 1976 to October 31, 1976, whereby KLM was to pay override commissions of 18 percent on the flown turnover. This agreement was approved by Bulterman. Pano, on behalf of Panmarc, received cash payments from KLM in the amounts of $7,000 and $6,000 on July 23, 1975, and October 10, 1975, respectively. Pano received additional such cash payments from KLM in 1976 in the following amounts: Amount
Date of Payment
$4,000
January 30, 1976
4,000
March 1, 1976
1,000
April 13, 1976
1,500
July 6, 1976
1,500
July 29, 1976
1,000
September 3, 1976
These amounts were given to Margaret Reischetal, who credited Pano's "advance of loan account" with Panmarc in the corresponding amounts. The money was deposited to Panmarc's bank account. Pano did not declare any dividend income in his tax returns for taxable years 1974 through 1976. OPINION *551 Issue 1. The Status of the Deficiency Determinations.
Petitioners contend that respondent's determination that override payments were made by KLM during the years 1974 through 1976 to Panmarc, and through it to Pano, was based solely on hearsay evidence and, therefore, is arbitrary and unreasonable and not entitled to the presumption of correctness. Respondent raises several contentions. First, he contends that these consolidated cases do not present a situation where this Court should look behind the statutory notice of deficiency. Second, respondent contends that even if such inquiry is proper, petitioners have not shown the determinations to be arbitrary and excessive. As a general rule, a deficiency determination is presumed to be correct. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). The presumption is procedural and places on petitioners the burden of proof to show that respondent's determination is incorrect. Rockwell v. Commissioner,512 F.2d 882 (9th Cir. 1975), cert. denied 423 U.S. 1015 (1975); *552 Barnes v. Commissioner,408 F.2d 65 (7th Cir. 1969), cert. denied 396 U.S. 836 (1969). Generally, this Court will not look behind the statutory notice of deficiency to examine the evidence used, the propriety of respondent's motives, the administrative policy or the procedure followed in making the determination. Dellacroce v. Commissioner,83 T.C. 269 (1984); Riland v. Commissioner,79 T.C. 185 (1982); Llorente v. Commissioner,74 T.C. 260 (1980), affd. in part, revd. in part and remanded in part 649 F.2d 152 (2d Cir. 1981); Jackson v. Commissioner,73 T.C. 394 (1979); Greenberg's Express, Inc. v. Commissioner,62 T.C. 324 (1974). The underlying rationale for the foregoing is that a trial before this Court is a de novo proceeding. Our determination of a taxpayer's tax liability must be based on the merits of the case and not on any previous record developed at the administrative level. Greenberg's Express, Inc. v. Commissioner,supra; *553 O'Dwyer v. Commissioner,28 T.C. 698 (1957), affd. 266 F.2d 575 (4th Cir. 1959), cert. denied 361 U.S. 862 (1959). Respondent's determinations may often rest upon hearsay or other inadmissible evidence, and we know of no general rule of law calling for a review of the materials that were before the Commissioner in order to ascertain whether he rested his determinations on improper evidence. Dellacroce v. Commissioner,supra;Rosano v. Commissioner,46 T.C. 681 (1966). The Courts have on occasion, however, recognized an exception to the rule of not looking behind the deficiency notice, in cases involving the alleged receipt of unreported income, where respondent introduces no substantive evidence but rests on the presumption of correctness and the taxpayer denies the receipt of the income and challenges the notice of deficiency on the grounds that it was arbitrary. Dellacroce v. Commissioner,supra;Jackson v. Commissioner,supra; *554 Llorente v. Commissioner,supra;Gerardo v. Commissioner,T.C. Memo. 1975-341, affd. in part, revd. in part and remanded in part 552 F.2d 549 (3d Cir. 1977). Petitioners argue that the instant consolidated cases are governed by the aforementioned exception. Jackson v. Commissioner,supra, involved a deficiency notice based on information regarding the taxpayer's alleged drug activities provided by an informant to a special agent of the Drug Enforcement Administration and to other agents with whom the special agent worked. The informant refused to testify during the trial of the case even though a writ of habeas corpus at testificandum was issued commanding his presence in order that he might testify. No evidence linking the taxpayer to any narcotics operation was introduced by the Commissioner. We held that the presumption of correctness ordinarily attaching to the notice of dificiency was inapplicable; the Commissioner's determination was shown to be arbitrary and excessive, and the burden of going forward with the evidence was shifted to respondent. *555 In Llorente v. Commissioner,supra, the Second Circuit held that the deficiency determination, computed under the expenditures method of reconstructing income, was issued arbitrarily and without factual foundation. The Court of Appeals found that the evidence before this Court -- the testimony of an undercover police agent who had seen and heard cocaine dealers speaking with the taxpayer about future cocaine shipments, further testimony of the agent regarding the information provided to him by an informant that the taxpayer, the informant, and one cocaine dealer had gone to a house to inspect 6 kilos of cocaine and that the taxpayer had examined the package due to the fact that some of the cocaine had been delivered in damp condition, the lack of credibility of the taxpayer's testimony, the taxpayer's indictment for conspiring to criminally possess and sell a controlled substance, and his guilty plea to the crime of attempted conspiracy to criminally possess a controlled substance -- was insufficient to support our conclusion that the notice of deficiency had not been issued arbitrarily, and reversed. In the Second Circuit's view "the evidence of record must at *556 least link the taxpayer with some tax-generating acts, such as the purchase or sale of controlled substances." [649 F.2d at 156.] A finding that the taxpayer was involved in any way, however undefined, with an illegal activity in which persons usually engage for profit falls short of the quantum of evidence necessary to support the presumption of correctness accorded to a statutory notice of deficiency. More than a mere peripheral contact is necessary to support a determination that the Commissioner acted rationally rather than arbitrarily. In Gerardo v. Commissioner,supra, the Court of Appeals for the Third Circuit, while affirming this Court in upholding the presumptive correctness of the Commissioner's statutory notice for part of the period involved, reversed and remanded the case as to another portion of the period. The difference in treatment was that for the first period the Commissioner had properly established the taxpayer as being engaged in the activity upon which the disputed unreported income was based; in the second period, he had not.The preliminary test which the Commissioner must pass to maintain the presumptive correctness of his statutory *557 notice, was stated by the Court of Appeals as follows: While we realize the difficulties which the Commissioner encounters in assessing deficiencies in circumstances such as are presented here, we nevertheless must insist that the Commissioner provide some predicate evidence connecting the taxpayer to the charged activity if effect is to be given his presumption of correctness. Here, the record is barren of that underlying evidence relating Gerardo to wagering operations [in the second period]. [Emphasis supplied. Gerardo v. Commissioner, 552 F.2d at 554-555.] In Dellacroce v. Commissioner,supra, we were again presented with the issue of the reasonableness of a statutory notice of deficiency. The Commissioner's determination that the taxpayer had received a $100,000 labor racketeering payoff in 1965, which he failed to report in income, was based on information furnished by an informant and on additional information contained in the special agent's report which had been prepared in connection with the alleged payoff. The informant was not an eyewitness to the alleged payoff, but informed the revenue agent assigned to the case that *558 he had observed the passing of envelopes and suitcases containing money from Goldman, the alleged payor of the $100,000, to the taxpayer on several occasions. We held that the notice of deficiency based on hearsay evidence -- the special agent's relation of the information given to him by an informant, who had been in turn told of the alleged payoff, and on the special agent's report linking the taxpayer to the alleged payoff -- was arbitrary and unreasonable in the absence of evidence in the record admissible to establish the truth of the facts asserted by the Commissioner to support it. The many decided cases regarding the so-called presumption of correctness and its impingement on the burden of proof and the burden of going forward, viz., the burden of persuasion and the burden of production, have been accurately described as a "muddy track." Dellacroce c. Commissioner,supra; Llorente v. Commissioner,supra.
The consolidated cases herein do not involve the receipt of money from an illegal activity as was the case in Gerardo v. Commissioner,supra, (illegal gambling); *559 Jackson v. Commissioner,supra, (drug activity); Llorente v. Commissioner,supra, (cocaine sales); and Dellacroce v. Commissioner,supra, (labor racketeering payoff). The alleged override payments here were not illegal. Admittedly, the violation of the regulations established by IATA -- enforced with varying success among its members -- carried with it severe sanctions for air carriers, for paying, and travel agents or tour operators, for receiving compensation in excess of the limits imposed by IATA. The levels of agency and tour operator compensation were not, however, regulated under United States law, nor did United States law require compliance with IATA's regulation; this was a private system. [16]
*560 We assume for purposes of this proceeding, but do not decide, that the limited exception to the general rule (that we will not look behind the statutory notice of deficiency to examine the evidence used in making the deficiency determination) applies in cases involving respondent's determination of taxpayer's receipt of unreported income, regardless of whether the alleged unreported income is from legal or illegal sources, where respondent fails to introduce substantive probative evidence linking the taxpayer to the specific tax-generating activity on which the disputed item in the notice of deficiency was based, and the taxpayer challenges the notice of deficiency on the grounds that it was issued arbitrarily. Under such circumstances, the exception to the general rule applies, and the fullowing results will follow: (a) If the taxpayer shows that respondent's statutory notice was arbitrary and capricious, he will have made a prima facie case demonstrating error on respondent's part. Cf. Helvering v. Taylor,293 U.S. 507 (1935). (b) Respondent's presumptive correctness then disappears, and the burden of going forward with the evidence then shifts to him to *561 rebut the taxpayer's prima facie case. (c) If the evidence presented is inadequate to destroy the taxpayer's prima facie case, then the taxpayer has carried his burden of proof (i.e., the burden of ultimate persuasion) and taxpayer will be entitled to prevail. Accepting the above as a correct statement of a rule which is difficult to enunciate, we nevertheless hold on the facts of the instant cases that petitioners' challenge to respondent's notices of deficiency herein must fail, and that such notices are entitled to their usual presumption of correctness. While it is true that respondent's determinations of additional income against these petitioners was based in part upon inadmissible hearsay, so far as the times and amounts of receipt are concerned, (see discussion infra in part 3 of this opinion) it is equally true that, in these cases, the following facts were established by direct and admissible testimony, including testimony of Pano himself: (a) Petitioners were engaged, in the years in question, in the travel agency business, promoting the sale of tours to overseas points; (b) Pano, through his corporations Panmarc and WTI, extensively used the services of *562 KLM in providing the airline transportation for these tours; (c) Within the period in question, and prior thereto, petitioners had extensive negotiations and several different agreements with KLM providing for the payment by KLM of override commissions with respect to such business. (c) Panmarc was entitled to be paid commissions and overrides from KLM for its services in this regard. We therefore hold that respondent has established in this record, by admissible and substantive evidence, that petitioners were directly linked to the income-producing activity which was the basis for respondent's determination of additional unreported income, within the meaning of Llorente,Gerardo,Jackson, and Dellacroce. See also Solimene v. Commissioner,T.C. Memo. 1982-370. Having withstood petitioners' initial challenge, respondent's statutory notices are entitled to their usual presumption of correctness, Welch v. Helvering,supra,Rule 142(a). Petitioners herein presented no affirmative evidence to demonstrate any error in respondent's said determinations, having contented themselves throughout this trial with attacking only the *563 basis for respondent's determinations, rather than the accuracy thereof. Subject to what follows hereinafter with respect to the statute of limitations issue in the case of Panmarc, therefore, respondent's determinations of deficiency must be upheld. Issue 2. Respondent's new issue.
In his answers to the petitions, respondent asserted additional unreported income against Pano and Panmarc based on Pano's alleged receipt of cash payments in the amount of $13,000 in 1975 and $13,000 in 1976. [17] Since this matter was not part of respondent's original determinations in his statutory notices, respondent bears the burden of proving that Pano and Panmarc received such additional unreported income. Rule 142(a). In the replies to respondent's answers, Pano admitted that KLM made payments directly to him in the amount of $13,000 in 1975 and $13,000 in 1976.Pano denied, however, respondent's allegation that the above-mentioned amounts inured to his personal benefit. Panmarc denied receipt of the alleged additional income. On the evidence before us we are satisfied that cash payments in the amount of $13,000 in 1975 and $13,000 in 1976 were *564 made to Pano for Panmarc, and that he handed these monies to Reischental, who recorded these payments in the Panmarc cash receipts book and credited Pano's advance of loan account; thus, taking the cash into account as repayment of a loan to Pano.Reischental testified that she credited Pano's advance of loan account in the amount of the cash payments "if I didn't know what it was for so I credited his account." We find hard to believe that Pano would hand cash to Reischental on several occasions without giving any indication to her as to the application of such monies, and that Reischental, without any rational basis to do so, would credit Pano's advance of loan account as opposed to any other account. Pano undoubtedly benefited from these payments that were receipts of Panmarc. These amounts were, therefore, constructive dividends to Pano. Pano did not declare any dividend income in his income tax returns pertaining to taxable years 1975 and 1976. On this issue we hold for respondent, so far as Pano is concerned. As to Panmarc, however, respondent's proof falls short. There was no proof that the payments constituted taxable income to Panmarc, as opposed to the repayment of *565 an advance or some other non-taxable receipt. Respondent also failed to establish that the funds were unreported by Panmarc. On this item, we sustain Panmarc. Issue 3. Additions to tax under section 6653(b).
In his statutory notices of deficiency, respondent determined that petitioners had received and omitted from their returns override payments paid by KLM and that this omission was due to fraud with intent to evade tax. Respondent so alleged in his answers to the petitions, and, additionally, alleged that petitioners failed to report cash payments in the amount of $13,000 and $13,000 in 1975 and 1976, respectively, with the purpose of defrauding the fisc. Pursuant to section 6653(b)(1), if any part of any underpayment of tax required to be shown on the return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. This 50 percent addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and a mechanism to reimburse the government for the expenses of the investigation and the loss resulting from the taxpayer's fraud. *566 Helvering v. Mitchell,303 U.S. 391 (1938). Whether fraud exists is a question of fact to be decided upon the entire record. Rowlee v. Commissioner,80 T.C. 1111 (1983); Gajewski v. Commissioner,67 T.C. 181 (1976), affd, without published opinion 578 F.2d 1383 (8th Cir. 1978); Stratton v. Commissioner,54 T.C. 255 (1970), Supplemental Opinion 54 T.C. 1351 (1970). Respondent has the burden of proving fraud by clear and convincing evidence. Section 7454(a); Stone v. Commissioner,56 T.C. 213 (1971); Rule 142(b). Respondent must establish (1) that petitioners underpaid their taxes and, (2) that part of petitioners' underpayment was due to fraud. Hebrank v. Commissioner,81 T.C. 640 (1983). When fraud is asserted for more than one taxable year respondent must show that some part of the underpayment is due to fraud for each taxable year for the corresponding addition to tax to be upheld. Professional Services v. Commissioner,79 T.C. 888 (1982); *567 Otsuki v. Commissioner,53 T.C. 96 (1969); Mensik v. Commissioner,37 T.C. 703 (1962), affd. 328 F.2d 147 (7th Cir. 1964), cert. denied 389 U.S. 1059 (1968). Fraud is never presumed but must be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85 (1970). Taxpayer's entire course of conduct must be examined to determine whether the requisite fraudulent intent is present. Stone v. Commissioner,supra;Otsuki v. Commissioner,supra;Strattov v. Commissioner,supra.Mere negligence is not proof of fraud, an intent or purpose to evade tax is essential. Estate of Briden v. Commissioner,11 T.C. 1095 (1948), affd. sub nom. Kirk v. Commissioner,179 F.2d 619 (1950). Fraud cannot be inferred from a mere inadvertent understatement of income. Holland v. United States,348 U.S. 121 (1954), or from a deficiency in taxes due to an honest mistake or poor judgment. *568 Iley v. Commissioner,19 T.C. 631 (1952). Finally, and of transcendent importance in the instant cases, is the proposition that respondent may not rely on the presumptive correctness of his statutory notice to assist him in carrying his burden of proof on the fraud issue. The presumption of correctness which attached to respondent's deficiency notice is merely a procedural device, not a substitute for evidence. See Rockwell v. Commissioner,supra at 885. Although respondent can rely on the presumption of correctness which attaches to his statutory notice in support of the deficiency, he may not so rely with respect to issues on which he has the burden of proof, as here. With respect to the fraud issue, the Commissioner must affirmatively prove that prtitioners, in fact, received taxable income, as one element in sustaining his burden of proof. Kashat v. Commissioner,229 F.2d 282 (6th Cir. 1956); Drieborg v. Commissioner,225 F.2d 216 (6th Cir. 1955); Olinger v. Commissioner,234 F.2d 823 (5th Cir. 1956); *569 Jones v. Commissioner,29 T.C. 601 (1957). In these cases, the evidentiary boot which pinched petitioner's foot on the deficiencies issue, discussed above, is now on respondent's foot, and, given the heavier burden of proof, section 7454(a), Rule 142(b), it pinches respondent even harder. On this record, we must hold that respondent has failed to carry his necessary burden of proof as to fraud with respect either to Pano or Panmarc. [18]
Respondent's determination that overrides were paid by KLM to petitioners through a Swiss bank account belonging to Pano during the years 1974, 1975 and 1976 does not satisfy the aforementioned standard. Respondent failed to introduce evidence in the record admissible to establish the truth of his allegations. At the trial of this matter, the Court heard testimony from seven witnesses: Huzar and John Bogler, special agents who testified as to the nature and extent of the investigation of Pano's businesses, the evidence before respondent in issuing the deficiency notice and the manner in which the deficiency was computed, respectively; *570 Luber, the KLM employee responsible for negotiating overrides, who testified about the numerous instances in which Pano and, or, his employees Gabriel and Masillo met with him to negotiate overrides, Reischental, who testified as to the manner in which the payments from KLM were recorded in the books of Panmarc and WTI; Mifsud, General Counsel of KLM in the United States; Gabriel, who testified as to the negotiations for the overrides; and Pano. The witnesses denied having any personal knowledge of whether override commissions were paid to petitioners. [19] At most, respondent established that overrides were aggressively negotiated for by Luber on behalf of KLM and by Pano, Gabriel and Masillo, on behalf of Panmarc and WTI. [20]
*571 Respondent strenuously argues that the existence of a Swiss bank account belonging to Pano and the fact that payments were made to this account by KLM is evidenced by answers 8 and 9 of the questionnaire or "vragenlijst" number 62, dated July 6, 1970, and the changes to the aforesaid questionnaire dated July 13, 1962, June 29, 1973 and February 13, 1974, respectively. [21] We do not agree. The answer to questions 8 and 9 of the "vragenlijst" number 62 reads: "With Mr. Anastasato, once per quarter, through a Swiss bank account (in Swiss francs)." The questions to which the "vragenlijsts" purport to be answers, as well as the questions which answers were later changed or amended were neither offered nor admitted in evidence. Respondent is asking us, in effect, to conceive a question to which the aforementioned sentence would be an answer; we would then have to find that the questions posed by us, taken together with the answers to those questions contained in the "vragenlijsts," support respondent's determination that monies were deposited to a Swiss bank account belonging to Pano and KLM, which monies represented overrides paid during the taxable years 1974, 1975 and 1976. We decline *572 respondent's invitation to engage in such an exercise of speculation. [22]
*573 Respondent contends that Luber's testimony regarding the routine practices of KLM in regard to the negotiation and payment of overrides supports his determination that override commissions were deposited to a Swiss bank account belonging to Pano during the years 1974, 1975 and 1976. We are not convinced that the aforementioned testimony warrants such a determination.The payment of the overrides was contingent upon a determination by KLM's head office in The Netherlands that the terms of the agreement, expressed in questionnaire form were within the parameters set by that office. Respondent failed to provide us with evidence as to the nature of these limitations, the fact that these agreements were in fact approved by the head office, or that the documents pertaining to the negotiations during the years 1974, 1975 and 1976 were not disapproved and returned to KLM's office in New York. Respondent argues that the fact that Pano acknowledged negotiating for and receiving a $310,500 payment for tour promotional support in 1975 evidences that Pano received unreported override payments in 1974, 1975 and 1976. Respondent argues, further, that this tour support payment was not reported *574 by petitioners. We do not think first, that Pano's admission that tour support payments were made in 1975 supports respondent's determination regarding the payment of overrides to a Swiss bank account, which was the sole basis of respondent's determination. Nor is there any evidence that such amounts, if received, were unreported. Second, it is clear that respondent seeks to raise new matter before this Court. [23] it is equally clear that such new matter must be properly pleaded by respondent. Estate of Horvath v. Commissioner,59 T.C. 551 (1973); Tauber v. Commissioner,24 T.C. 179 (1955). If the new matter is raised neither in the pleadings nor in an amendment thereto, the issue will ordinarily not be heard by this Court. Rollert Residuary Trust v. Commissioner,80 T.C. 619 (1983), on appeal (6th Cir. August 29, 1983); Markwardt v. Commissioner,64 T.C. 989 (1975); Estate of Mandels v. Commissioner,64 T.C. 61 (1975); Robertson v. Commissioner,55 T.C. 862 (1971); *575 Philbrick v. Commissioner,27 T.C. 346 (1956); Hettler v. Commissioner,16 T.C. 528 (1951). Since respondent has failed to properly plead this new matter and since we conclude that petitioners have had no fair notice of such matter, Rule 31(a), we do not address this new issue raised in his opening brief. See Seligman v. Commissioner, 84 T.C.     No. 15 (February 12, 1985). With respect to the additional unreported income asserted by respondent in his answers, in the amount of $13,000 for each of the years 1975 and 1976, we have previously held that respondent has failed to prove the existence of such unreported income in the case of Panmarc. In the case of Pano, we have that such unreported income has been proved. However, under the circumstances shown by this record, we hold that respondent has failed to carry his necessary burden of proof to show fraud on the part of Pano *576 in failing to report these items. On the fraud issue, therefore, we hold for petitioners. Issue 4. The Statute of Limitations - Panmarc.
Finally, we must consider whether the statute of limitations bars the assessment or collection of any deficiency against Panmarc for the taxable years in issue. Section 6501(a) prescribes the general rule that a deficiency in income tax shall be assessed within three years after the return was filed. The bar of the statute of limitations is an affirmative defense and must be pleaded by the party raising it. [24] Rule 39. Having raised it in its pleadings, Panmarc bore the burden of proof on this issue. Rule 142(a). In establishing that the notice of deficiency was sent more than three years after the filing of the income tax returns for the taxable years 1974 through 1976, Panmarc made a prima facie case for itself. The burden of going forward with the evidence then shifted to respondent, who had the burden of proving fraud in each year, so that the exception to the general period of limitations on assessment and collection contained in section 6501(c)(1) would operate to toll the running of the three-year period. Respondent *577 concedes that assessment of additional taxes against Panmarc is barred by section 6501(a), absent a finding of fraud. Consistent with our holding that respondent has failed to carry his burden of proving fraud for the years 1974 through 1976 by clear and convincing evidence, we hold for petitioner in docket No. 14632-81 on this issue. To reflect the foregoing, Decision will be entered under Rule 155 in docket No. 14631-81.
Decision will be entered for the petitioner in docket No. 14632-81.
Footnotes
1. Respondent has conceded that a recomputation of the deficiencies, pursuant to the statutory notices of deficiency, will result in small changes in favor of petitioners. ↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
3. Respondent determined that no part of the alleged underpayment of tax for the years 1974 through 1976 was due to fraud on the part of Janice Anastasato. Accordingly, the sec. 6653(b)↩ addition to tax does not apply to her. 4. In his answers to the petitions for these years, and in support of his determinations of fraud under sec. 6653(b), respondent affirmatively alleged that petitioners had additional unreported taxable income in each of the years 1975 and 1976 in the amount of $13,000, which was not reflected in his statutory notice, and that petitioners' unpaid tax in Docket 14631-81 for said years was $287,698 for 1975 and $8,573 for 1976, rather than the amounts shown in the statutory notice. (No such allegation was made concerning increased deficiencies in Docket 14632-81.) Respondent made no claim, however, for increased deficiencies or for additional amounts under sec. 6653(b)↩ resulting therefrom, as required by sec. 6214(a), but has continued to contend throughout this proceeding only for the deficiencies and additions to tax as contained in his statutory notices.
5. Pano Anastasato and Janice Anastasato were separated around 1970.↩
6. This limit applied to tours; the maximum commission payable for business and first class travel was 7 percent.↩
7. Ultimately, investigations by the Federal Trade Commission and the Securities and Exchange Commission confirmed the pervasiveness of this practice in the airline industry. ↩
8. An investigation by he Dutch government confirmed this fact.↩
9. The information item was not introduced in evidence; it seems that the document was lost by respondent.↩
10. We do not question the validity of Pano's assertion of a Fifth Amendment privilege, nor do we draw any inferences therefrom. Cf. Dellacroce v. Commissioner,83 T.C. 269↩ (1984).
11. The normal commission was paid by deducting the commission from the tickets sold and remitting to KLM the net amount (purchase price less commission) of the ticket.↩
12. The special agent's report was admitted in evidence for the limited purpose of describing the evidence before respondent in issuing the notice of deficiency. ↩
13. The report was neither offered nor admitted in evidence.↩
14. See footnote 4, supra.↩
15. Arne Duyf held this position until 1973. In 1973, Charles Bulterman, then Assistant Manager for Passenger Sales of KLM in the United States, was promoted to the position held by Duyf; Bulterman held this position until 1976, when he was posted in The Netherlands. Duyf was promoted to Assistant Manager for Passenger Sales of KLM in the United States.↩
16. The only regulation on such payments was established in September 1976, when the Civil Aeronautics Board required the public filing of levels of agency compensation. Thus, the reasons for requiring that the strictest confidentiality be observed by travel agents and tour operators were twofold: (1) the desire of air carriers to avoid being subjected to substantial monetary fines by IATA and (2) the fact that the travel agent or tour operator could be deprived of the right to act for air carriers that were members of IATA.↩
17. See footnote 4, supra.↩
18. Respondent determined no addition for fraud against Janice. See footnote 3, supra.↩
19. Paul Mifsud, general counsel of KLM commenced his employment with KLM in April 1976, after most of the events in these consolidated cases took place. ↩
20. Gabriel Warshawsky, a former employee and one of the principal negotiators of overrides on behalf of WIT, stated that Pano complained about KLM not paying the overrides that they negotiated for. Respondent would have us conclude, based on his statement, that Pano received overrides that were deposited to a Swiss bank account. We refuse to do so.↩
21. Petitioners objected to the admissibility of the "vragenlijsts" at trial. Petitioners' argument is twofold: (1) Luber was not qualified to testify as to the routine practice of KLM's head office in The Netherlands regarding the payments based upon "vragenlijsts" that were prepared from memoranda supplied by KLM sales agents, thus such testimony should not have been admitted under Rule 406, Fed. R. Evid.; (2) Luber was not a "custodian or other qualified witness" that could attest to the fact that the "vragenlijsts" were kept in the course of a regularly conducted business activity, and that it was the regular practice of that business to make such a record, under Rule 803(6), Fed. R. Evid.↩ In view of our disposition of the issues herein, we need not discuss whether the above-mentioned testimony and exhibits were properly admitted. 22. We note that the "vragenlijst" number 62 is dated July 6, 1970, and would presumably refer to transactions during that year, which taxable year is not before us. Concededly, the third change to the "vragenlijst," amending the answer to question 1(a) is dated February 13, 1974, a year that is before this Court. This fact affords little relief to respondent, however, as we are in no better position to make any inferences as to the existence of a Swiss bank account belonging to Pano with the amendment to question 1(a) than without it. Also, the amendment refers to question 1(a), not to questions 8 and 9.↩
23. Respondent did not determine in his statutory notices that such payments were made, nor did he allege it in his answers. No amendments to the answers were filed in the cases herein. Cf. Seligman v. Commissioner,↩ 84 T.C.     No. 15 (February 12, 1985).
24. Pano failed to plead the bar of the statute of limitations. Thus, this defense is unavailable to him.↩