TEXAS SPEED DISTRIBUTORS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; WADE W. WIENER AND LINDA L. WIENER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Texas Speed Distribs., Inc. v. Commissioner
Docket Nos. 27524-90, 27586-90
United States Tax Court
T.C. Memo 1993-446; 1993 Tax Ct. Memo LEXIS 457; 66 T.C.M. (CCH) 834; September 27, 1993, Filed *457 Decisions will be entered under Rule 155. For petitioners: Bruce Locke and Larry W. Sherlock. For respondent: Richard T. Cummings and Wanda M. Cohen. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: By separate statutory notices of deficiency dated October 12, 1990, respondent determined deficiencies in Federal income tax and additions to tax as follows: Texas Speed Distributors, Inc.
Docket No. 27524-90
Additions to Tax
Tax Year Ended
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
January 31, 1987
$ 7,423
$ 371
50% of the interest
due on $ 7,423
Wade W. Wiener and Linda L. Wiener
Docket No. 27586-90
Additions to Tax Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6653(a)(1)(A)
6653
6661
(a)(1)(B) 1983
$ 209,141
$ 10,457
[1]
-- --
$ 37,277
1984
22,900
1,145
[1]
-- --
5,725
1986
61,977
-- --
$ 3,099
[1]
15,494
1987
3,673
-- --
184
[1]
-- Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years at issue, and all rule references *458 are to the Tax Court Rules of Practice and Procedure. All references to petitioner are to Wade W. Wiener. After concessions by the parties, the following questions remain for decision: (1) Whether petitioner received dividend income of $ 191,526.45 or some lesser amount from Texas Speed Distributors, Inc. (Texas Speed) during 1983; [1]
(2) whether the statutory period of limitations for assessment and collection of additional income tax from the Wieners for 1983 has expired; and (3) whether petitioner realized income during 1986 from sales of four parcels of real property. After threading our way through a labyrinth of evidentiary and procedural issues and doing our best with the sparse and confusing record created *459 by the parties, we hold that petitioner received taxable dividend income of $ 99,795.57 during 1983. This amount exceeds 25 percent of the gross income reported on the Wieners' 1983 income tax return, so that the applicable 6-year statutory period of limitations for assessment and collection of additional income tax for 1983 has not expired. We further hold that during 1986 petitioner realized income of $ 56,064 from the sales of four parcels of real property. FINDINGS OF FACT Some of the facts have been stipulated and they are so found. The stipulation of facts and attached exhibits are incorporated herein. Texas Speed had a Rosharon, Texas, address when the petition in docket No. 27524-90 was filed. The Wieners resided in Rosharon, Texas, when the petition in docket No. 27586-90 was filed. I. Texas Speed Dividend Distribution
From 1969 through May 1983, petitioner owned and operated a racing car parts distribution business. Petitioner started his parts distribution business as a retail operation, with stores in Houston, Amarillo, Corpus Christi, and Victoria, Texas. Sometimes during the 1970s, petitioner started Texas Speed, a wholesale parts distribution business, *460 to "funnel" parts purchased from manufacturers to his retail stores. Over the years, petitioner's retail stores faced increasing competition from mail order firms, and, in 1981, petitioner got out of the retail business. Petitioner, however, continued to own and operate Texas Speed, which he had incorporated in 1979, selling racing car parts to other retail outlets in the Southwest. Texas Speed had difficulties in generating positive cash flow during the late 1970s and early 1980s. Petitioner sometimes found it necessary to forgo his salary and the rent he was owed on the warehouse property that he leased to Texas Speed, so that Texas Speed could meet its payroll obligations. Petitioner also occasionally borrowed money, sometimes more than $ 100,000, from his father to meet Texas Speed's obligations to its suppliers. Petitioner repaid these loans as Texas Speed's customers paid their bills. In early 1983, petitioner decided to get out of the parts distribution business altogether. On February 28, 1983, petitioner received $ 5,000 from Southwest Parts Warehouse, Inc. (Southwest Parts) as an earnest money deposit for the operating assets of Texas Speed. On May 2, 1983, Texas *461 Speed, using the name 1 W Enterprises, Inc., [2] *462 and petitioner sold Texas Speed's operating assets and the warehouse property that Texas Speed had been leasing from petitioner to Southwest Parts for $ 1,181,745, of which $ 781,745 [3] was allocated to the operating assets and $ 400,000 was allocated to the warehouse property. The purchase price included promissory notes of Southwest Parts to Texas Speed and petitioner in the principal amounts of $ 600,000 and $ 400,000, respectively, [4] $ 99,795.57 in cash paid to petitioner by Southwest Parts at the time of sale, a $ 5,000 deposit paid to petitioner by Southwest Parts on February 28, 1983, and sale expenses paid by Southwest Parts. The cash that Southwest Parts paid to petitioner was in consideration for Texas Speed's operating assets. However, petitioner did not turn over to Texas Speed any of the cash he received from Southwest Parts. The operating assets that Texas Speed sold to Southwest Parts included inventory, business equipment, trade accounts receivable, and a covenant not to compete. Texas Speed used the cost method to value its inventory, and, at the time of the asset sale, Texas Speed's inventory had a cost value of $ 632,856.62, *463 as determined by a physical count 2 days prior to the sale. At the time of the asset sale, Texas Speed also had accounts receivable in the face amount of $ 270,575.77. These amounts were reported in schedules attached to the Southwest Parts purchase agreement. Texas Speed's Federal corporation income tax return for the fiscal year ended January 31, 1984, was prepared by Alice Ropel, an employee of Frank Logan and Associates, a small business bookkeeping and income tax return preparation firm. Nevertheless, petitioner had Jack Schakett, a personal friend and an audit partner of a big six accounting firm, review the treatment of the asset sale on Texas Speed's income tax return. Mr. Schakett, for purposes of his review, relied on the information reported on Texas Speed's income tax returns for the fiscal years ended January 31, 1983 and 1984. Mr. Schakett therefore assumed that Texas Speed's proposed income tax return for the fiscal year ended January 31, 1984, correctly showed Texas Speed's inventory at the time of the asset sale to be $ 207,497. Mr. Schakett's assumption led him to conclude that total liabilities plus shareholder equity exceeded total assets by $ 431,061, and *464 that Texas Speed must have made a payment to petitioner in that amount. Mr. Schakett therefore revised Texas Speed's corporation income tax return to show an outstanding loan of $ 431,061 by Texas Speed to petitioner. Schedule L of Texas Speed's corporation income tax return as filed for the fiscal year ended January 31, 1984, shows retained earnings of $ 65,214 for the beginning of the taxable year and $ 16,083 for the end of the taxable year. Texas Speed reported a basis of $ 265,664 in the assets sold to Southwest Parts and an adjusted basis (to reflect depreciation) of $ 226,743. In so doing, Texas Speed did not include any portion of the accounts receivable in the face amount of $ 270,575.77 that it sold to Southwest Parts. Mr. Schakett did not sign Texas Speed's revised corporation income tax return for the fiscal year ended January 31, 1984. Rather, Mr. Schakett gave Texas Speed's revised return to petitioner, who took it back to Frank Logan and Associates to be signed and filed. The Wieners reported, on their calendar year 1983 Federal income tax return, gross income of $ 41,486.13, including $ 5,000 that petitioner had received from Southwest Parts in consideration *465 for the covenant not to compete. However, the Wieners did not include in gross income the additional $ 99,795.57 received by petitioner on Texas Speed's asset sale to Southwest Parts. II. Songbird Ranch
Petitioner is a licensed pilot, who had resided in the Polly Ranch airport community, [5] southeast of Houston, Texas, in Friendswood, Texas, for some years. Polly Ranch is a large airport community of approximately 120 homes, 30 to 40 of which are adjacent to an airplane runway. However, a majority of the residents of Polly Ranch did not own an airplane. Petitioner and his neighbor pilots disagreed with many of the nonpilot Polly Ranch residents about the upkeep and use of the runway. Petitioner and Irwin W. Murmer, a Polly Ranch neighbor and pilot, discussed developing a small airport community of their own. Sometime in 1984 or 1985, petitioner *466 and Mr. Murmer met with three other pilots, John R. Hall, Jesse E. Bootenhoff, and David Mason Hertenberger, to discuss their plans for an airport community. Although petitioner and Messrs. Murmer, Hall, Bootenhoff, and Hertenberger did not enter into any written agreements as a result of these discussions, they did decide that if they did participate in any such airport community, it would be small, contain no more than seven homes, and that each household's land acquisition cost should be approximately $ 50,000. On August 5, 1985, petitioner purchased the Songbird Ranch property, 96 acres of land southwest of Polly Ranch in Brazoria County, Texas, for $ 215,001. [6] Petitioner's sole purpose for making the Songbird Ranch purchase was to develop the property as an airport community. Although, prior to the purchase, petitioner told Messrs. Murmer, Hall, Bootenhoff, and Hertenberger about his intention to acquire the Songbird Ranch property, he gave them the impression that his plan to purchase the Songbird Ranch property was not conditioned on their participation in the new airport community. Petitioner purchased the Songbird Ranch property without a definite commitment on the *467 part of Messrs. Murmer, Hall, Bootenhoff, and Hertenberger to participate in the new airport community. Shortly after the purchase, petitioner subdivided the Songbird Ranch property that surrounds Songbird Drive, the development's only road and runway, into 14 lots of approximately 5 acres. Of the 14 lots, 2 are in a flood plain and therefore can not be developed for residential use. The other 12 lots have frontage on the runway and are suitable for residential use. On April 21, 1986, petitioner transferred the Songbird Ranch property to Songbird Ranch, Inc. (the Songbird corporation), a corporation whose shares were owned entirely by petitioner and Mrs. Wiener, for the sole purpose of protecting the Wieners from individual liability for any personal injury that might occur on the property. In 1985 and 1986, petitioner, *468 either individually or through the Songbird corporation, spent $ 230,269 paving the runway and making other improvements to the Songbird Ranch property. On May 13, 1986, the Songbird corporation sold lot 6 of the Songbird Ranch property to Jesse and Jerry Bootenhoff for $ 47,486. On May 20, 1986, the Songbird corporation sold lot 4 to Irwin and Geraldine Murmer and lot 5 to David Hertenberger. The Murmers and Mr. Hertenberger paid $ 48,746.50 and $ 55,000 for their respective lots. On July 1, 1986, the Songbird corporation sold lot 3 to John Hall for $ 54,547. While the Songbird corporation granted each transferee a perpetual easement on the runway, the warranty deeds do not require petitioner to follow any suggestions of the transferees regarding improvements to the Songbird Ranch property. The warranty deeds also do not contain any provision restricting petitioner or the Songbird corporation from selling any of the remaining Songbird Ranch lots. Sometime after 1985, petitioner built, on lot 11 of the Songbird Ranch property, an airplane hangar that also contains his living quarters. Petitioner also set aside the portions of the Songbird Ranch property that are not adjacent *469 to the runway for use as a recreation area by each of the Songbird Ranch households. Petitioner further set aside Songbird Ranch lots 1 and 2 for two additional pilots that he and Messrs. Murmer, Hall, Bootenhoff, and Hertenberger hoped would join the Songbird Ranch airport community. However, at the time of trial, these lots had not been sold and the Songbird corporation had title to them. The Songbird corporation also had title to the other 8 Songbird Ranch lots that were not sold to Messrs. Murmer, Hall, Bootenhoff, and Hertenberger, including the 2 lots in the flood plain, the runway, and the portions of the Songbird Ranch property that are not adjacent to the runway. The Wieners did not report, on their 1986 Federal income tax return, any income from the sales of the Songbird Ranch lots to Messrs. Murmer, Hall, Bootenhoff, and Hertenberger. Respondent determined that petitioner's basis in each lot was $ 37,429 and that petitioner realized aggregate gains of $ 56,064 on the sales of lots 3, 4, 5, and 6. In so doing, respondent allocated petitioner's total acquisition and improvements cost almost equally to the 12 useable lots adjacent to the runway and none of such cost *470 to the runway or any of the remaining acreage. OPINION I. Texas Speed Dividend Distribution
The primary issue raised by respondent's 1983 statutory notice of deficiency is whether petitioner received a taxable dividend distribution from Texas Speed. That notice determined that Texas Speed had made loans to petitioner that it canceled in 1983, so as to result in a distribution to petitioner. Although the record on this issue is not clear in various respects, it is clear to us that the loan issue is a symptom of the problems that invariably surface when a business required to compute taxable income by using inventories understates its closing inventory on its income tax returns and fails to take corrective measures prior to a sale of the business and its assets. Understating inventory values on Federal income tax returns is a long standing, but improper, method of deferring income and reducing current taxes. Primo Pants Co. v. Commissioner, 78 T.C. 705, 723 (1982); see also Graichen, "Undervaluation of Inventories -- Tax and Accounting Problems: Implications of Sections 481 and 1311-15", 20th Ann. N.Y.U. Fed. Tax Inst. 423 (1962) (quoting *471 President Kennedy's tax message of April 20, 1961); Hoffman, "Inventory Problems: Real or Imaginary?", 40 Taxes 951 (1962). In a merchandising or manufacturing business, "gross income" means total sales less cost of goods sold, sec. 1.61-3(a), Income Tax Regs., and cost of goods sold is the sum of opening inventory and current year purchases less ending inventory. Primo Pants Co. v. Commissioner, supra at 723. Thus, any undervaluation of ending inventory increases cost of goods sold for the taxable year, decreasing sales income and reducing reported profits for the year. Id. Income so deferred will be recognized when closing inventory is correctly valued or the business and its assets are sold. See id.; see also Graichen, supra at 423. Before we address the substantive issue of whether petitioner received a taxable dividend distribution from Texas Speed, we must retrace the labyrinth of evidentiary and procedural issues on which the parties spent the bulk of their time and attention in presenting and arguing their case on this issue. A. Evidentiary and Procedural Issues
1. Testimony of respondent's revenue agent
*472 Petitioners contend that we erred in permitting respondent's revenue agent, Connie Julian, to testify to alleged statements made to her by Richard Duncan, petitioner's authorized representative. Petitioners argue that the statements attributed to Mr. Duncan by Ms. Julian, if true, were made in an attempt to settle petitioner's tax liability and therefore were settlement offers inadmissable as evidence at trial. Petitioners further argue that respondent's pretrial summary of Ms. Julian's testimony did not apprise them of this anticipated testimony, as required by the Court's standing pretrial order, and that respondent's failure to apprise them of such testimony effectively limited their opportunity to introduce pertinent evidence on this issue. Respondent argues that Mr. Duncan's statements were not settlement offers because he made them to a revenue agent and revenue agents do not have authority to settle cases. Respondent also argues that Mr. Duncan's statements were not settlement offers because he made them on audit before respondent had proposed any adjustment to petitioner's tax liability. Respondent therefore argues that there was no controversy to settle at the time the *473 statements were made. Respondent further argues that Mr. Duncan's statements, even if made in the course of compromise negotiations, are admissable because respondent could have discovered them outside of those negotiations. We have held that communications between a taxpayer or an authorized representative and a revenue agent may be a settlement negotiation within Fed. R. Evid. 408. Abatti v. Commissioner, T.C. Memo 1978-392, revd. on other grounds 644 F.2d 1385 (9th Cir. 1981). However, in the case at hand, we are not required to reach this question. While we allowed Ms. Julian to testify to these alleged statements at trial, respondent has failed to persuade us that Mr. Duncan had knowledge of the facts necessary to make these statements or that he actually did make them. We therefore gave no weight to Ms. Julian's testimony about these alleged admissions, and petitioners' objection is immaterial. 2. The Southwest Parts purchase agreement
Petitioners contend that we erred in admitting the Southwest Parts purchase agreement into evidence. Petitioners argue that, contrary to our standing pretrial order, *474 respondent introduced the purchase agreement into evidence without providing a copy of the agreement to petitioners at least 15 days prior to trial. Petitioners argue that respondent thereby surprised them, to the prejudice of the presentation of their case. Respondent, on the other hand, argues that petitioners should not have been surprised by respondent's use of the purchase agreement, inasmuch as respondent requested and received her copy of the purchase agreement from petitioners at least 1 year prior to trial. Respondent further argues that petitioners were not prejudiced by respondent's failure to provide a copy of the purchase agreement to them because petitioners already had a copy of the purchase agreement with their papers. Our standing pretrial order provides, in pertinent part, that Any documents or materials which a party expects to utilize in the event of trial (except for impeachment), but which are not stipulated, shall be identified in writing and exchanged by the parties at least 15 days before the first day of the trial session. The Court may refuse to receive in evidence any document or material not so stipulated or exchanged, unless otherwise agreed *475 by the parties or allowed by the Court for good cause shown. [Emphasis added.]
We have enforced our 15-day rule where we were convinced that there was no good cause for the lack of notice and the opposing party would have been prejudiced. See, e.g., Cebollero v. Commissioner, T.C. Memo. 1990-618, affd. 967 F.2d 986 (4th Cir. 1992); Gray v. Commissioner, T.C. Memo. 1990-283. However, enforcement of the 15-day rule is not required where the opposing party would not be prejudiced by the failure of the party introducing the evidence to identify it before trial. Cf. Nat Harrison Associates v. Commissioner, 42 T.C. 601, 617 (1964)(Party who failed to comply with the Court's Rules was entitled to rely on an alternative argument made at trial because opposing party was not surprised by that argument); see also Seligman v. Commissioner, 84 T.C. 191, 198 n.7 (1985), affd. 796 F.2d 116 (5th Cir. 1986). Petitioners and their counsel knew that petitioner's representative had given respondent a copy of the Southwest *476 Parts purchase agreement to support petitioner's contention that Texas Speed had not lent money to him, but had understated its ending inventory and accounts receivable on its corporation income tax return for its fiscal year ended January 31, 1984. Respondent's trial memorandum, which was served on petitioners several days before trial, referred to that pretrial argument of petitioner. Petitioners therefore had reason to know that respondent would introduce the Southwest Parts purchase agreement if petitioners should raise the understated inventory argument at trial. Respondent had the Southwest Parts purchase agreement marked for identification after petitioners raised their understated inventory argument during their direct examination of Mr. Schakett. Respondent introduced the purchase agreement into evidence only after petitioners continued to contend at trial that a key element in resolving the dividend issue was Texas Speed's understatement of its ending inventory on its income tax return for the fiscal year ended January 31, 1984. On this record, petitioners were not surprised by respondent's use of the Southwest Parts purchase agreement and were not prejudiced by respondent's *477 failure to formally identify this document as one likely to be used at trial. We accordingly overrule petitioners' objection to the admission of the purchase agreement into evidence. [7]
3. Quasi estoppel
Respondent argued, at trial and on brief, that the doctrine of quasi estoppel, sometimes known as the duty of consistency, precludes the Wieners from denying that petitioner received the loans reported on Texas Speed's income tax return. Respondent argues that petitioner caused and directly benefited from any understatement of Texas Speed's tax liability. Respondent argued that she relied on Texas Speed's income tax return for the year *478 ended January 31, 1984, and that the Wieners cannot disclaim the loans now that the statutory period of limitations against Texas Speed has expired for that year. Quasi estoppel is an affirmative defense that must be raised in the pleadings. Rule 39; Goos v. Commissioner, T.C. Memo. 1991-146, affd. without published opinion 947 F.2d 935 (3d Cir. 1991). Inasmuch as respondent's answer did not raise this defense and respondent did not file a motion to amend, the defense was waived and we will not address its merits. We have considered the other evidentiary and procedural issues raised by the parties, and we find them either without merit or, in light of our holding, unnecessary to resolve. B. Dividend Income
Respondent contends that during 1983 petitioner received $ 191,526.45 of taxable dividend income from Texas Speed. Respondent argues that petitioner had borrowed $ 431,061 from Texas Speed and that Texas Speed canceled petitioner's debt obligation when it sold its operating assets to Southwest Parts. Respondent argues that the debt cancellation was a distribution of property to petitioner, and that this distribution *479 was a dividend, taxable to the extent of corporate earnings and profits. Petitioners argue that petitioner never borrowed any money from Texas Speed, so that it did not distribute any property to petitioner on which he could be subject to Federal income tax. Petitioners also argue that the dividend portion of any distribution made to petitioner by Texas Speed is limited to $ 16,083, the amount of earnings and profits reported on Texas Speed's income tax return for the fiscal year ended January 31, 1984. At the outset, we note that the Wieners have properly raised a statute of limitations defense with respect to this issue. In the petition filed in docket No. 27586-90, the Wieners allege that the period of limitations for assessment and collection of additional taxes for 1983 expired before respondent mailed them the statutory notice of deficiency. Respondent, in the answer to the petition, denies the Wieners' allegation, alleging that they omitted from gross income an amount in excess of 25 percent of the gross income reported on their income tax return and that the applicable period of limitations therefore is 6 years under section 6501(e)(1) rather than the 3 years generally *480 provided under section 6501(a). The parties agree that respondent bears the burden of proving facts to establish the substantial omission of gross income exception to the usual 3-year statutory period of limitations. Bardwell v. Commissioner, 38 T.C. 84, 92 (1962), affd. 318 F.2d 786 (10th Cir. 1963); Reis v. Commissioner, 1 T.C. 9, 12 (1942), affd. 142 F.2d 900 (6th Cir. 1944). Texas Speed's income tax return for the year ended January 31, 1984, indicates that Texas Speed lent $ 431,061 to petitioner. Texas Speed's income tax return also erroneously reported that, at the time of the asset sale, the cost value of its closing inventory was $ 207,497. The physical count taken 2 days before the asset sale, a schedule of which is attached to the Southwest Parts purchase agreement, shows that Texas Speed's closing inventory had a cost value of $ 632,856.62. In addition, another schedule attached to the purchase agreement showed accounts receivable of $ 270,575.77. Mr. Schakett admitted that he revised Texas Speed's income tax return for the year ended January 31, 1984, *481 to report loans to shareholder of $ 431,061 to offset a discrepancy between Texas Speed's reported assets and its reported liabilities and shareholder's equity. Mr. Schakett also admitted that he did so without actual knowledge of any loans made by Texas Speed to petitioner, and that his decision to revise the income tax return was grounded on his assumption that the value of Texas Speed's closing inventory, at the time of its asset sale, was $ 207,497. The record also shows that from the late 1970s to early 1980s, Texas Speed had difficulties in generating sufficient cash flow to meet its normal business obligations, let alone make significant loans to petitioner. From time to time, Texas Speed had difficulties meeting payroll, and petitioner occasionally had to borrow money, sometimes in excess of $ 100,000, from his father to pay Texas Speed's suppliers. Although petitioner repaid these loans as Texas Speed's customers paid their bills, this pattern of borrowing indicates that Texas Speed lacked the financial wherewithal to lend $ 431,061 to petitioner. Texas Speed's cash flow troubles, when coupled with Mr. Schakett's admissions and the obvious understatement of the value *482 of the ending inventory, lead us to conclude that Texas Speed had no substantial outstanding loans to petitioner during 1983. Even if we were to agree that Texas Speed had made substantial loans to petitioner, respondent failed to introduce any evidence that Texas Speed canceled petitioner's obligation on these loans during the taxable year before us. To the contrary, while respondent argues that Texas Speed canceled petitioner's debt obligation when it sold its assets to Southwest Parts, Texas Speed's income tax return for the fiscal year ended January 31, 1984, reflects outstanding loans by Texas Speed to petitioner of $ 431,061. Thus, the sole evidence offered by respondent to support the contention that petitioner borrowed $ 431,061 from Texas Speed, also shows that Texas Speed had not canceled petitioner's obligation on the loans before January 31, 1984. Under the circumstances, we cannot say, even if respondent had established that petitioner borrowed $ 431,061 from Texas Speed, that petitioner had cancellation of indebtedness income for 1983. Although respondent was unable to produce any evidence to establish that petitioner borrowed money from Texas Speed, the record *483 shows that petitioner received a distribution of $ 99,795.57 from Texas Speed. On May 2, 1983, petitioner received that amount from Southwest Parts as partial payment for the operating assets of Texas Speed. Inasmuch as this disbursement by Southwest Parts was a partial payment for Texas Speed's operating assets, it was properly due and owing to Texas Speed, and petitioner's failure to turn it over to Texas Speed was, in effect, a distribution of corporate earnings and profits. We also have concluded that Texas Speed had earnings and profits in excess of the $ 16,083 reported on Texas Speed's income tax return for the fiscal year ended January 31, 1984. While the statutory phrase "earnings and profits" is not defined in the Internal Revenue Code, earnings and profits are generally determined by making adjustments to the corporation's taxable income. Anderson v. Commissioner, 67 T.C. 522, 527 (1976), affd. per curiam 583 F.2d 953 (7th Cir. 1978); see also Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 7.03, pp. 7-9, 7-13 (5th ed. 1987). Moreover, for purposes of determining the dividend *484 income tax consequences of a corporate distribution, it does not matter if the corporation accumulated the earnings and profits in prior years or earned them during the year of the distribution. Anderson v. Commissioner, supra at 527; see also sec. 316(a). Inasmuch as Texas Speed substantially understated, on its income tax return for its fiscal year ended January 31, 1984, the value of its closing inventory at the time of the asset sale, it incorrectly reported a $ 49,131 loss from its business operations for the year ended January 31, 1984. Texas Speed's "true" sales income from business operations for the year ended January 31, 1984, including any income deferred by reason of inventory understatements in prior taxable years, [8] exceeded $ 300,000. See infra note 9. This increase in sales income is partially offset by the resulting conversion into a loss of the gain reported by Texas Speed on the installment sale of its operating assets. [9] *486 Nevertheless, reconstructing Texas Speed's taxable income to reflect these changes, we are persuaded that Texas Speed's taxable income for the fiscal year ended January 31, 1984, including any income *485 deferred from prior taxable years, see supra note 7 and accompanying text, was at least $ 58,760. [10] After an adjustment for tax paid in 1983, [11] Texas Speed's earnings and profits for the year ended January 31, 1984, rather than being reduced by $ 49,131, must be increased by at least $ 54,879. This amount, when added to the $ 65,214 of reported earnings and profits accumulated by Texas Speed in prior years, gave Texas Speed at least $ 120,093 of earnings and profits available for distribution, an amount in excess of the $ 104,796 that petitioner received in 1983 from Southwest Parts in part payment for Texas Speed's operating assets. We accordingly hold that during 1983 Texas Speed made a taxable dividend distribution to petitioner of $ 99,795.57. We have determined that the Wieners omitted *487 from gross income, on their 1983 income tax return, a taxable dividend distribution of $ 99,795.57. Because this amount exceeds 25 percent of $ 41,486.13, the amount the Wieners reported as gross income on their 1983 income tax return, the period of limitations for assessment and collection of additional taxes for 1983 is 6 years and has not expired. Sec. 6501(e)(1). The Wieners therefore have a 1983 deficiency arising from unreported income of $ 99,795.57. II. Songbird Ranch
Petitioners contend that respondent erred in determining that petitioner realized income from the 1986 transfers of Songbird Ranch lots to Messrs. Murmer, Hall, Bootenhoff, and Hertenberger. Petitioners argue that petitioner acquired the Songbird Ranch property on behalf of the Songbird Ranch community, and that he was merely delivering the Songbird Ranch lots to their true owners when the Songbird corporation "sold" them to Messrs. Murmer, Hall, Bootenhoff, and Hertenberger. Petitioners therefore argue that the transfers of the lots to Messrs. Murmer, Hall, Bootenhoff, and Hertenberger were not taxable dispositions of property. [12] However, petitioners have not asserted or argued, if we should *488 hold the transfers to be taxable dispositions of property by petitioner, that respondent erred in computing the gains realized by petitioner on these transfers. *489 There is no statute of limitations question with respect to this issue. Thus, respondent's determination is presumptively correct, and petitioners have the burden of proving it erroneous. Rule 142(a). For the reasons that follow, we conclude that petitioners have not met their burden. Although petitioners contend that petitioner acquired and held title to the lots at issue as nominee and agent for Messrs. Murmer, Hall, Bootenhoff, and Hertenberger, the record in this case is replete with evidence to the contrary. The warranty deed evidencing petitioner's purchase of the Songbird Ranch property does not indicate that petitioner made the purchase as an agent or nominee. Petitioner offered no evidence to show that petitioner made such a representation to the seller of the property. However, petitioner did represent to Messrs. Murmer, Hall, Bootenhoff, and Hertenberger that his decision to purchase the Songbird Ranch property would not be influenced by their participation in the new airport community. Petitioner, in fact, purchased the property without any definite commitment that Messrs. Murmer, Hall, Bootenhoff, and Hertenberger would be participating in the new airport community. *490 Petitioner, in addition to the autonomy he exercised in purchasing the Songbird Ranch property, has sole discretion with respect to improvements to the Songbird Ranch property. While Messrs. Murmer, Hall, Bootenhoff, and Hertenberger can suggest improvements, petitioner has no legal obligation to follow their suggestions. Moreover, Messrs. Murmer, Hall, Bootenhoff, and Hertenberger cannot prevent petitioner from selling any of the remaining Songbird Ranch lots, even if that sale would lead to more houses adjacent to the runway than they had informally agreed upon. Accordingly, petitioners have not shown that petitioner was a nominee and agent for Messrs. Murmer, Hall, Bootenhoff, and Hertenberger when he purchased the Songbird Ranch property. We therefore sustain respondent's determination that petitioner realized gain from the 1986 transfers of Songbird Ranch lots to Messrs. Murmer, Hall, Bootenhoff, and Hertenberger. Inasmuch as petitioners do not dispute respondent's computation of the gains realized by petitioner on the sales of Songbird Ranch lots 3, 4, 5, and 6, we hold that petitioner realized aggregate gains of $ 56,064 on these sales. To reflect the foregoing, and *491 because of concessions by the parties, Decisions will be entered under Rule 155. Footnotes
1. 50% of the interest due on the deficiency.↩
1. Although respondent determined, in the statutory notice of deficiency, that petitioner received dividend income of $ 430,861, respondent concedes, on brief, that Texas Speed's earnings and profits were no more than $ 191,526.45 and that the taxable portion of any distribution was limited to that amount.↩
2. Although Texas Speed did not adopt a plan of liquidation, it changed its name to 1 W Enterprises, Inc., because the business name "Texas Speed Distributors" was one of the assets sold to Southwest Parts. For convenience and clarity, we will continue to refer to the corporation, which sold its operating assets to Southwest Parts, as Texas Speed.↩
3. The Form 6252 attached to Texas Speed's corporation income tax return for the fiscal year ended January 31, 1984, reported the selling price of the operating assets to be $ 781,985. The parties have not explained the $ 240 discrepancy between the price reported on the seller's statement and the price reported on Texas Speed's return, but it has no effect on the outcome of this case.↩
4. Southwest Parts' promissory notes to Texas Speed and petitioner provided for interest of 10 percent, payable monthly, with the principal payable in the 37th month after closing. In 1986 or 1987, Southwest Parts defaulted on both promissory notes. Shortly thereafter, the warehouse property and operating assets still held by Southwest Parts were returned to petitioner and Texas Speed, respectively.↩
5. An airport community is a residential development in which individual lots surround a roadway that also serves as a runway for small aircraft owned by residents.↩
6. Petitioner borrowed approximately $ 215,000 from his stockbroker, secured solely by the securities in petitioner's account with the stockbroker, to finance the purchase of the Songbird Ranch property.↩
7. We note that, even if we had sustained petitioners' objection, petitioner's admission during cross-examination that Texas Speed had approximately $ 600,000 worth of inventory at the time of its asset sale to Southwest Parts is credible evidence that supports our determination that Texas Speed had sufficient earnings and profits to cover the distribution we have found.↩
8. Inasmuch as a dividend is any distribution out of earnings and profits accumulated after Feb. 28, 1913 or current earnings and profits, see sec. 316(a), it is not necessary for us to determine how much, if any, of the income was deferred from the Texas Speed's prior taxable years.↩
9. Texas Speed's gross profit (loss) from the installment sale of its operating assets is the selling price received less the adjusted basis of the property sold and sale expenses. Because Texas Speed understated the value of its inventory at the time of the asset sale, it also understated its reported adjusted basis in the property sold. Texas Speed further understated its reported adjusted basis when it erroneously did not include its outstanding accounts receivable, at the time of the asset sale, in its cost basis in the property sold. Accordingly, a comparison of the computation of Texas Speed's gross profit (loss), as reported and as revised, shows the following: As Reported
As Revised
Basis of property sold
$ 265,664 This figure reflects the $ 425,360 worth of inventory that Texas Speed did not report on its return and the $ 270,576 worth of outstanding accounts receivable that it did not include in basis.
*↩ $ 961,600 Depreciation
(38,921)
(38,921)
Adjusted basis of property sold
$ 226,743 $ 922,679 Commissions and other sale expenses
61,396 61,396 $ 288,139 $ 984,075 Selling Price
$ 781,985 $ 781,745 Adj. Basis and other sale expenses
(288,139)
(984,075)
Gross Profit (Loss)
$ 493,846 $ (202,330)
10. The following shows Texas Speed's taxable income as reported for the year ended January 31, 1984, and as revised to reflect our findings that Texas Speed understated its closing inventory at the time of the asset sale and understated its cost basis in the property it sold by not including, in basis, an amount for the accounts receivable sold to Southwest Parts. ↩
As Reported
As Revised
Gross receipts
$ 513,827 $ 513,827 Cost of goods sold
610,545 185,185 Gross Profit
$ (96,718)
$ 328,642 Interest
40,000 40,000 Capital gain or loss
94,170 (202,330)
Ordinary Income from
Sale of business property
20,754 Total Income
$ 58,206 $ 166,312 Total Deductions
(107,337)
(107,552)
Taxable Income
$ (49,131)
$ 58,760 11. In 1983, Texas Speed paid Federal income tax of $ 3,881.25 for the fiscal year ended January 31, 1983.↩
12. Petitioners also argue, on brief, that any income from the transfers of the individual Songbird Ranch lots is attributable to the Songbird corporation rather than petitioner. However, we have consistently refused to consider issues that are first raised on brief, to the surprise and prejudice of the opposing party. Seligman v. Commissioner, 84 T.C. 191, 198 (1985), affd. 796 F.2d 116 (5th Cir. 1986); see also Ware v. Commissioner, 92 T.C. 1267, 1268 (1989), affd. 906 F.2d 62↩ (2d Cir. 1990). In the case at hand, petitioners' counsel conceded, at trial, that the Songbird corporation held title to the Songbird Ranch properties at issue as an agent for petitioner and that the corporation therefore could be disregarded for income tax purposes. A posttrial argument that seeks to negate a prior concession is prejudicial to the opposing party, and we will not consider it.